660 F.2d 754
 1981-2 Trade Cases 64,208
 Joe ZINSER, et al., Plaintiffs-Appellants,
v.
CONTINENTAL GRAIN COMPANY, et al., Defendants-Appellees.
John SPEARMAN, et al., Plaintiffs-Appellants,
v.
CONTINENTAL GRAIN COMPANY, et al., Defendants-Appellees.
Edgar CLEVELAND, individually and on behalf of each and all
other persons similarly situated who were wheat farmers in
the State of Oklahoma and sold wheat on the open market from
May 1, 1972 to September, 1, 1972, Plaintiffs-Appellants,
v.
Clarence PALMBY; Continental Grain Company; Cargill,
Incorporated; Louis Dreyfus Corporation; Cook
Industries; Garnac Grain Company; and
Bunge Corporation, Defendants-Appellees.
 Nos. 79-2296, 79-2310.
 United States Court of Appeals,
Tenth Circuit.
 Argued March 16, 1981.
Decided Aug. 6, 1981.
Rehearing Denied Sept. 4, 1981.
 
 Joseph Alioto of Alioto & Alioto, San Francisco, Cal. (James W. Witherspoon, Earnest L. Langley, Marion J. Craig, III, and James E. Elliott of Witherspoon, Aiken & Langley, Hereford, Tex., and Michael T. Garrett of Law Offices of Michael T. Garrett, Clovis, N. M., with him on the brief), for plaintiffs-appellants in No. 79-2296.
 Frank Gregory, Tulsa, Okl., and John M. Merritt of John M. Merritt, Inc., Oklahoma City, Okl., for plaintiffs-appellants in No. 79-2310.
 Mark H. Alcott, New York City (Simon H. Rifkind, Arthur L. Liman, and Lewis R. Clayton of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Judson S. Woodruff, Peter B. Bradford, John N. Hermes, and Lou Ann Ables of McAfee & Taft, Oklahoma City, Okl., Neal R. Allen of Culton, Morgan, Britain & White, Amarillo, Tex., for defendant-appellee Continental Grain Co.
 Robert J. Emery and James M. Gaitis of Robert J. Emery & Associates, Oklahoma City, Okl., for defendant-appellee Clarence D. Palmby.
 Ben L. Burdick and John J. Love, Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, Okl., appeared on behalf of appellee Cargill, Incorporated, in Case No. 79-2310 and adopted the brief of appellees Continental Grain Company and Clarence Palmy.
 Elliott C. Fenton and Ronald L. Day, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Okl., and J. Paul McGrath, Jack Kaufmann and Michael D. DiGiacomo, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, appeared on behalf of appellee Louis Dreyfus Corporation in Case No. 79-2310 and adopted the brief of appellees Continental Grain Company and Clarence Palmby.
 Page Dobson, Holloway, Dobson, Hudson & Bachman, Oklahoma City, Okl., appeared on behalf of appellee Cook Industries, Inc., in Case No. 79-2310 and adopted the brief of Continental Grain Company and Clarence Palmby.
 Hugh D. Rice, Rainey, Ross, Rice & Binns, Oklahoma City, Okl., and Cadwalader, Wickersham & Taft, New York City, appeared on behalf of appellee Garnac Grain Co., Inc., and adopted the brief of Continental Grain Company and Clarence Palmby.
 James D. Fellers and Burck Bailey, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., appeared on behalf of appellee Bunge Corporation in Case No. 79-2310 and adopted the brief of Continental Grain Company and Clarence Palmby.
 Before SETH, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 
 
 1
 These three antitrust cases were brought by wheat farmers in Oklahoma, Texas, and New Mexico against six grain export companies and a former governmental official. The two defendants named in all three complaints are Continental Grain Company, a Delaware corporation with its principal place of business in New York City, and Clarence D. Palmby, a former Assistant Secretary of the United States Department of Agriculture.[1] The central issue in these consolidated appeals is the applicability of Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, rehearing denied, 434 U.S. 881, 98 S.Ct. 243, 54 L.Ed.2d 164 (1977). The trial court ruled that Illinois Brick controlled and dismissed all three actions. The plaintiffs appeal.
 
 
 2
 The three complaints with which we are concerned were filed between October, 1972, and January, 1973, in the United States District Courts for the Western District of Oklahoma and the Northern District of Texas. In November, 1973, the cases were consolidated for pretrial proceedings in the Western District of Oklahoma by order of the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407 (1976). In re Wheat Farmers Antitrust Class Action Litigation, 366 F.Supp. 1087 (Jud.Pan.Mult.Lit.1973).[2]
 
 
 3
 The trial court on June 30, 1975, certified three classes, consisting of wheat farmers who had sold wheat on the open market from May 1, 1972, until September 1, 1972, in the following geographic areas: (1) the state of Oklahoma (the Cleveland case); (2) thirty-four counties in the Northern Panhandle region of the state of Texas (the Zinser case); and (3) Curry County, New Mexico (the Spearman case).[3]
 
 
 4
 The three complaints here involved are almost identical in their content. In each instance the action was instituted under the authority of sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22 (1976) to recover treble damages for violations of the antitrust laws. Cleveland alleged only antitrust violations under section 1 of the Sherman Act, 15 U.S.C. § 1. Zinser and Spearman alleged violations under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1976).[4]
 
 
 5
 The central allegation of all three complaints is that Continental Grain Company and Clarence Palmby, and others, conspired in 1972 to suppress information regarding impending wheat sales to the Soviet Union. The plaintiffs' theory of the case is that this conspiracy resulted in a depressed market condition, thereby allowing Continental Grain, and other grain exporters, to buy wheat from "middlemen"[5] at lower prices than would have been the case if the information had not been suppressed. According to the complaints, since the middlemen sold wheat to the grain exporters at lower prices than would have been paid if the information about forthcoming sales to the Soviet Union had been publicly known, the middlemen, in turn, purchased wheat from the wheat farmers at reduced prices. It was on this general theory that the plaintiffs claimed antitrust violations and treble damages.
 
 
 6
 Needless to say, there was extensive discovery. It eventually developed during the course thereof that none of the three named plaintiffs sold any wheat directly to any defendant during the time period here involved. Instead, each sold to a middleman, who in turn sold to Continental Grain, or some other grain exporter. Furthermore, discovery also disclosed that the vast majority of the class members did not sell to any defendant, but rather sold their wheat to middlemen, who, in turn, sold either to someone else in the distribution chain, or to one of the defendants. In fact, not more than ninety-two members of the Cleveland class, consisting of 43,000 Oklahoma farmers, sold directly to Continental; not more than 212 members of the Zinser class, consisting of 12,000 Texas farmers, sold to Continental; and only sixty-two members of the Spearman class of between 600 and 1,500 New Mexico farmers sold directly to Continental.[6]
 
 
 7
 As mentioned, the instant cases were instituted in 1972 and 1973, and were certified as class actions in 1975. Discovery continued unabated throughout this time, and after. Then, on June 9, 1977, the Supreme Court announced its decision in Illinois Brick. In order to allow the parties an opportunity to consider the applicability of Illinois Brick, the trial court granted an extension of time to permit additional discovery and submission of briefs on the matter. The trial court also held a hearing at which counsel presented their respective positions on the matter. Finally, on June 25, 1979, the trial court entered an order holding that Illinois Brick applied to the instant cases and was in fact dispositive thereof. More specifically, the trial court held that Illinois Brick precluded an antitrust action by one who was only an "indirect seller" to the defendants, an "indirect seller" being one who did not deal directly with any defendant, but rather sold his wheat to a middleman who, in turn, sold either to a defendant or to some other link in the distribution chain.
 
 
 8
 As above indicated, none of the three class representatives, i. e., Cleveland, Zinser, or Spearman, sold his wheat directly to any defendant, and there were only a total of not more than 366 farmers in all three classes who sold their wheat directly to the defendants. The trial court found that, under the circumstances, a continuation of the class actions was not warranted. Accordingly, with the three class representatives unable to proceed further under Illinois Brick, the trial court, applying Fed.R.Civ.P. 23(a), declined to recertify the classes. The trial court then dismissed all actions "without prejudice."
 
 
 9
 Both the plaintiffs and defendants filed timely motions under Fed.R.Civ.P. 59. These motions were disposed of by order on November 13, 1979. In that order the trial court adhered to its earlier ruling that Illinois Brick barred recovery by all persons who did not sell their wheat directly to one of the defendants during the pertinent time frame. The trial court also adhered to its earlier ruling that, all factors considered, those relatively few farmers who had sold their wheat directly to one of the defendants during the pertinent time period would not be allowed class certification.
 
 
 10
 Numerous matters not referred to in the trial court's order of June 25, 1979, were raised by the Rule 59 motions and disposed of in the order of November 13, 1979. Specifically, the several plaintiffs sought leave to amend their pleadings so that the actions could proceed as ones based on fraud and deceit and civil conspiracy, with jurisdiction based on diversity. The trial court denied this request on several grounds, the primary one being that the request to amend came "too late," namely, some seven years after commencement of the litigation, and that the cases from their inception were based on alleged antitrust violations. In the same vein, the trial court noted that even after Illinois Brick was announced, the plaintiffs made no effort to amend until the trial court determined that Illinois Brick barred the present proceeding. The trial court also declined to award the plaintiffs their costs or attorney fees on the ground that they had not prevailed. Zinser and Spearman by their post-trial motion requested that their cases be transferred back to the United States District Court for the Northern District of Texas. This request was also denied.
 
 
 11
 Finally, a request was made that the trial court vacate a protective order entered on January 4, 1974. That order precluded all the named parties and counsel from initiating any communication with the class members without the prior permission of the court.[7] This order was apparently entered by consent of all parties. In his post-trial motion counsel for the plaintiffs asked that the order be rescinded so that the members of the three classes could be advised as to the current status of the case. The trial court denied this request.
 
 
 12
 The defendants also filed a post-judgment motion under Rule 59(e) and 60(a), requesting clarification of the June 25, 1979, order. The trial court granted this motion and amended its earlier order to provide that the claims of all members who did not sell directly to any defendant were dismissed with prejudice, and that the claims of those who did sell directly to a defendant were dismissed without prejudice. Plaintiffs next filed a timely notice of appeal.
 
 
 13
 As indicated at the outset, the central issue concerns the applicability of Illinois Brick. The appellants' basic position is that Illinois Brick simply does not apply. The trial court did not agree with this argument. Nor do we.
 
 
 14
 In Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231, rehearing denied, 393 U.S. 901, 89 S.Ct. 64, 21 L.Ed.2d 188 (1968), the precursor of Illinois Brick, the plaintiff, a shoe manufacturer, sought treble damages from the defendant, a manufacturer and distributor of shoe machinery. The plaintiff, who was a customer of the defendant, alleged that the defendant had monopolized the shoe machinery industry and unlawfully initiated the practice of only leasing some of its machinery to the plaintiff, rather than selling it outright to the plaintiff. As a result, according to the plaintiff, there was, in effect, an overcharge, which was the difference between what the plaintiff paid defendant in shoe machine rentals and what it would have paid had defendant been willing to sell the machines. 392 U.S. at 483-84, 88 S.Ct. at 2226-27.
 
 
 15
 The defendant in Hanover Shoe claimed that the plaintiff had suffered "no legally cognizable injury," since the plaintiff had passed on any illegal overcharge to its customers in the form of a higher price on its shoes. The District Court rejected this pass-on defense, and the Court of Appeals affirmed. On certiorari, the Supreme Court also affirmed. The Supreme Court held that when a buyer shows that the price paid by him is illegally high, and also shows the amount of such overcharge, he has made out a prima facie case of injury and damage under section 4 of the Clayton Act, and that the fact that the buyer may have later passed on the amount of the overcharge to his customers does not defeat his cause of action. In other words, a pass-on theory could not be used by way of defense.
 
 
 16
 In Illinois Brick, the plaintiffs attempted to use a pass-on theory by way of offense. There the plaintiffs, the State of Illinois and 700 other governmental entities, claimed treble damages on the ground that the defendants had engaged in a price-fixing conspiracy. The plaintiffs' theory was that the defendants, concrete block manufacturers, overcharged "middlemen" to whom they sold their blocks, with the middlemen then passing on the overcharge to the plaintiffs, which had not dealt with the defendant.[8] Extending the rule of Hanover Shoe in what it believed to be a symmetrical fashion, the Supreme Court ruled that a pass-on theory could not be used offensively by an indirect purchaser against an alleged violator of antitrust laws.[9]
 
 
 17
 From Illinois Brick, we learn that in an antitrust treble damage case involving price-fixing the plaintiff must have dealt directly with the alleged violator. We recognize that in Illinois Brick the plaintiffs were buyers, whereas, in the instant cases, the plaintiffs are sellers. Such fact, however, does not render the rule of Illinois Brick inapplicable. In the instant cases, the claim is that, because the defendants violated antitrust laws, they were able to buy wheat at depressed prices from middlemen, and that the middlemen, in turn, purchased wheat from the plaintiffs at reduced prices. In Illinois Brick, an indirect purchaser could not recover for an overcharge which had been passed on to him. It logically follows that an indirect seller, i. e., one who did not deal with the defendant, may not recover for an undercharge set in motion by the indirect buyer's unlawful activities.
 
 
 18
 A case applying the general rule of Illinois Brick to a fact situation similar to the present one is In re Beef Industry Antitrust Litigation, 600 F.2d 1148 (5th Cir. 1979), rehearing denied, 616 F.2d 569 (5th Cir.), cert. denied, Safeway Stores, Inc. v. Meat Price Investigators Assn., --- U.S. ---- - ----, 101 S.Ct. 280-81, 66 L.Ed.2d 137 (1980). There the plaintiffs were ranchers and feeders, or both. The defendants were twenty-five retail food chains, a wholesale grocer, the retail chains' national trade association, and a beef industry price reporting publication. The plaintiffs alleged that the defendants combined to fix at artificially low levels the prices at which they purchased beef from slaughterhouses and meat packers, which in turn, caused the plaintiffs to receive less for their cattle sold to the meat packers. Although the plaintiffs did not deal directly with any defendant, it was their theory that they received less for their cattle which they sold to the slaughterhouses because of the defendants' antitrust activity.
 
 
 19
 In Beef Industry, as here, the plaintiffs' basic position was that Illinois Brick simply had no application. The Fifth Circuit rejected this argument and held that the general rule of Illinois Brick did apply, and that such would bar the plaintiffs, none of whom had sold cattle to any defendant, from recovery in an antitrust action. We recognize that the Fifth Circuit went on to hold that the plaintiffs came within an exception to the Illinois Brick rule. However, in our view, the plaintiffs in the present case do not come within any exception to the rule. The relevance of Beef Industry is that the rule of Illinois Brick precludes an antitrust action by a seller who alleges price-fixing by a defendant with whom he has not dealt directly, unless the seller can bring himself within some exception to the general rule.
 
 
 20
 As indicated, there are exceptions to the Hanover-Illinois Brick rule. In Hanover Shoe, the Supreme Court recognized that if the plaintiff in that case, who had dealt directly with the defendant, had a pre-existing cost-plus contract with its customer, then a pass-on theory of defense might be permitted. Similarly, in Illinois Brick, where the plaintiffs had not dealt with the defendants, the Supreme Court again recognized that if the plaintiffs in that case had a pre-existing cost-plus contract with the middlemen, which they did not, then the plaintiffs could have used the pass-on theory offensively, i. e., they would have had a cause of action against the defendants with whom they had no direct dealings. Also, in Illinois Brick, the Supreme Court further recognized that the pass-on theory might be permitted "where the direct purchaser is owned or controlled by its customer."
 
 
 21
 Recognizing that the Fifth Circuit in Beef Industry held that the plaintiffs came within an exception to the rule of Illinois Brick, we do not believe the plaintiffs in the instant case have brought themselves within any such exception. In Beef Industry, the Fifth Circuit held that there was the "functional equivalent" to a pre-existing cost-plus contract. In thus holding, the Fifth Circuit relied on the allegation that in buying live cattle the packers strictly applied a set formula to a Yellow Sheet reflecting the defendants' wholesale beef prices. We find nothing comparable in the instant case. Be that as it may, the Supreme Court has indicated that exceptions to Illinois Brick are exceedingly narrow in scope, and, we believe, should be few in number. In our view, any exception should not be given an expansive application, lest it swallow the rule and become the rule itself.[10]
 
 
 22
 As indicated, in its order of June 25, 1979, the trial judge not only held that Illinois Brick applied to all who had not themselves dealt with Continental, but also refused to certify as a class those who had dealt directly with Continental. It is conceded that the question of whether those persons who sold to the defendants should have been certified as a class was a discretionary matter. Our study of the matter convinces us that the trial judge considered all relevant factors and did not abuse his discretion when he refused to certify.[11]
 
 
 23
 By timely post-trial motions, the parties raised several matters, some of which apparently had not been previously urged. All were denied, and plaintiffs suggest that such action constitutes error.
 
 
 24
 Specifically, after the trial court had ruled that Illinois Brick applied, the plaintiffs sought leave to amend their pleadings so as to include claims based on fraud and deceit or civil conspiracy, with jurisdiction based on diversity. In this regard the plaintiffs assert that such claims were, in reality, already pleaded and amendment was not actually necessary. We do not agree.
 
 
 25
 The present causes of action were clearly based only on antitrust statutes, and the request to amend the pleadings to include claims based on state law was not made until after the trial court ruled that Illinois Brick applied. To hold that the present complaints set forth not only claims for antitrust violations but also claims for fraud and deceit would reduce the rules of pleading to a shambles. Suffice it to say, the trial court did not abuse its discretion in refusing to allow the plaintiffs to amend their complaints so as to include additional and different claims. For seven years the matter had proceeded as an antitrust case, and it was too late to convert the present proceedings to something different. In Beef Industry, the Fifth Circuit also held that the trial court did not abuse its discretion in denying post-judgment motions to amend. See also Summit Office Park, Inc. v. United States Steel Corp., 639 F.2d 1278 (5th Cir. 1981), in which dismissal was based on Illinois Brick and the denial of a motion to amend was held not to constitute an abuse of discretion.
 
 
 26
 Other matters raised on appeal need not be considered in any detail. The trial court did not err in refusing to transfer the Zinser and Spearman cases back to the Northern District of Texas. This request was only made after the handwriting was on the wall. Similarly, the trial court did not err in denying plaintiffs' request for attorney fees.
 
 
 27
 Because of a recent Supreme Court decision, one final matter requires comment. As indicated, the trial judge in 1974 entered a protective order requiring the named parties and counsel to obtain court permission before contacting members of the class. We are advised that such order was in accord with the practice at that time, and that there was no objection to the entry of such an order. However, in their post-judgment motion the plaintiffs asked that the order be lifted. The trial court denied the request, and the matter is raised on appeal.
 
 
 28
 In Gulf Oil Co. v. Bernard, --- U.S. ----, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981), the Supreme Court held that an order similar to the one in the instant case was inconsistent with the general policies embodied in Fed.R.Civ.P. 23, and that any order of this type must be based on a "clear record and specific findings that reflect a weighing of the need for limitation and the potential interference with the rights of the parties." In view of Gulf, the protective order should not have been entered, and, upon subsequent request, should have been vacated. All of this, of course, is by way of hindsight. But to clear the record, that portion only of the trial court's judgment is reversed. In all other regards, the judgment is affirmed.
 
 
 
 [1]
 The other five grain companies, named as defendants in only one of the three cases, are Cargill, Inc.; Louis Dreyfus Corp.; Cook Industries, Inc.; Garnac Grain Co., Inc. and Bunge Corp. These companies are named as defendants in the case in which Edgar W. Cleveland, an Oklahoma wheat farmer, is the named plaintiff representing Oklahoma wheat farmers. See note 3 infra
 Continental Grain and Clarence D. Palmby, former Assistant Secretary of the United States Department of Agriculture, were named as defendants in all three cases. A central allegation is that Palmby, who was hired by Continental after the grain sales were completed, was bribed by Continental. According to the plaintiffs' theory, Palmby exchanged confidential government information about the grain sales for a position with Continental.
 
 
 [2]
 In addition to the decision consolidating these cases, there have been two other published opinions during the nine-year history of this litigation. In re Wheat Farmers Antitrust Class Action, 440 F.Supp. 1022 (D.D.C.1977), was a case in which Judge Sirica considered a motion to produce certain documents, which the Government claimed were classified and subject to a claim of executive privilege. Cleveland v. Palmby, 75 F.R.D. 654 (W.D.Okl.1977), dealt with the taking of a deposition of an employee of defendant Cook Industries, Inc
 
 
 [3]
 The three cases were:
 (1) Cleveland v. Palmby. Named Plaintiff Edgar W. Cleveland represented a class of about 43,000 Oklahoma wheat farmers. In addition to Continental and Palmby, there were five other grain companies which were named as defendants. See note 1 supra.
 (2) Zinser v. Continental Grain Co. Named Plaintiff Joe Zinser represented a class of about 12,000 wheat farmers in thirty-four designated counties in the Panhandle and adjacent areas of north Texas.
 (3) Spearman v. Continental Grain Co. Named Plaintiff John Spearman represented between 600 and 1,500 wheat farmers in Curry County, New Mexico.
 
 
 [4]
 The injury complained of was the same in each instance, i. e., that, because of the alleged conspiracy, the plaintiffs sold their wheat at artificially depressed prices. In practical effect, all of the claims amount to contentions that, because of the defendants' actions, prices were fixed at artificially low levels, thereby benefitting the defendants to the detriment of the several plaintiffs
 
 
 [5]
 Middlemen include such entities as county grain elevator companies and farmer co-operatives
 
 
 [6]
 These numbers were supplied by counsel for Continental at the request of the District Court. The information was taken from Continental's records
 
 
 [7]
 All parties and their lawyers were ordered not to initiate any communication with potential and actual class members who were not named parties. The order, which was proposed by counsel for the defendants, specifically stated that the lawyers were permitted to communicate with prospective clients when the contact was initiated by the prospective client rather than the attorney. The order was aimed at preventing client solicitation
 
 
 [8]
 The defendants in Illinois Brick manufactured concrete blocks and sold them primarily to masonry contractors. The masonry contractors, in turn, submitted bids to general contractors for the masonry portions of construction projects. The general contractors submitted bids to the plaintiffs, which were the State of Illinois and 700 other governmental entities, including counties and cities. 431 U.S. at 726, 97 S.Ct. at 2064
 The distributive chain in Illinois Brick, therefore, resembles that which often exists in the wheat industry, at least in the number of links in the distributive chain. The wheat farmers often sell to county grain elevator companies, which, in turn, sell to larger companies, which sell to the defendants. This is not always true, since, in some cases, farmers sell directly to the defendant grain companies. In other cases, farmers deal directly with farmer co-operatives. Also, the wheat sometimes is handled by only one middleman, who, in turn, deals with the defendants. As indicated, however, in many cases there are four links in the distributive chain, just as there are in the concrete block industry which was scrutinized in Illinois Brick.
 
 
 [9]
 Passing-on often means the process in which a buyer shifts all of an overcharge to the next link in the distributive chain. For example, a wholesaler who was overcharged by the manufacturer from whom he bought goods would simply add to the purchase price a certain amount to reflect mark-up for costs and profits. The resulting sum would be the price which the wholesaler would charge to the retailer to whom he sold the item. In this example, the overcharge is simply "passed on" from the wholesaler to the retailer, since it is reflected in the wholesaler's charge to his customer, the retailer
 The wheat farmers allege the converse of the above example. I. e., instead of passing on an overcharge, those in the wheat distribution chain allegedly passed on an undercharge, or an artificially low price, which was the result of an illegal conspiracy between the defendants.
 
 
 [10]
 In support of our strong belief that any exception to the rule of Illinois Brick should be narrow in scope, see Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573 (3rd Cir. 1979). There the Third Circuit held that indirect purchasers of consumer bags could not recover treble damages from the manufacturer of the bags in the absence of proof that there were pre-existing fixed quantity, cost-plus contracts at each level of distribution between the direct purchasers from the defendant manufacturer and the plaintiffs, and that therefore the plaintiffs had absorbed the illegal overcharge in its entirety
 
 
 [11]
 Fed.R.Civ.P. 23(a) provides:
 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 Judge Daugherty found the classes should not be recertified because, inter alia, the vast majority of potential class members were eliminated as plaintiffs. Therefore, the number of direct sellers was not large enough to meet the numerosity requirement. Further, he found that the test for meeting that requirement is not one of numbers alone, "but rather a determination of impracticability of joinder." See, e. g., Bennett v. United States, 266 F.Supp. 627 (W.D.Okl.1965).
 More importantly, since none of the named plaintiffs sold directly to the defendants, there were no class representatives. In the Oklahoma case, there apparently was no volunteer to replace Cleveland. While there apparently were proposed new class representatives in the other two cases, the court found that the proposed substitutes had not shown "that they would make adequate financial and other commitments to the actions or that they do not suffer from any conflicts of interests." So there were no class representatives for the proposed new classes and the lower court acted properly in refusing to certify.
 See also Sosna v. Iowa, 419 U.S. 393, 403, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975); Holt v. Moore, 541 F.2d 460, 462 (4th Cir. 1976); Britt v. McKenney, 529 F.2d 44, 45 (1st Cir.), cert. denied, Burden v. McKenney, 429 U.S. 854, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976).