MERICAN, INC., Merican Curtis, Inc., and Merican Curtis, Ltd.

v.

CATERPILLAR TRACTOR CO.

Civ. A. No. 80–3723.

United States District Court, E.D. Pennsylvania.

Sept. 28, 1984.

Alan Schnoll, Philadelphia, Pa., Robert C. Levy, Berryl A. Speert, Allan P. Hillman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiffs.

Edward W. Mullinix, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., John DeQ. Briggs, III, David C. Murchison, P.C., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

VANARTSDALEN, District Judge.

Plaintiffs filed the present action nearly four years ago, alleging that defendant Caterpillar Tractor Co. (Caterpillar) violated § 1 of the Sherman Act, 15 U.S.C. § 1, by altering its system for collecting a service fee from its authorized dealers in order to exclude plaintiffs and other independent marketers from competing in the overseas sale and servicing of Caterpillar electrical generator sets. Plaintiffs originally sought monetary damages under § 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. In March of 1982, Caterpillar moved to dismiss plaintiffs' claims for monetary damages, because plaintiffs were indirect purchasers and thus barred by the

rule of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). This court denied Caterpillar's motion, but certified the *Illinois Brick* issue to the court of appeals pursuant to 28 U.S.C. § 1292(b), and the court of appeals granted review. The court of appeals then reversed this court's order, holding that the rule of *Illinois Brick* bars plaintiffs from seeking damages under § 4 of the Clayton Act. *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958 (3rd Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984).[1]

In the aftermath of the court of appeals' decision, the parties have moved in opposite directions. Plaintiffs have filed a motion for leave to amend their complaint to replace the rejected § 4 claim with a claim for damages under the common law of civil conspiracy. Caterpillar, on the other hand, filed a motion for summary judgment as to plaintiffs' remaining claim for injunctive relief. For the reasons that follow, plaintiffs' motion will be denied, and Caterpillar's motion will be granted.

Most of the relevant facts are set forth at length in the court of appeals' opinion. Briefly, Caterpillar distributes its electrical generator sets through a network of authorized dealers. Under the terms of the distribution agreement between Caterpillar and its dealers, Caterpillar offers the dealers a 5% discount off the list price of its electrical generator sets in exchange for the dealer's obligation to service Caterpillar's products in the dealer's assigned service territory. If a dealer sells a Caterpillar generator set that receives its "initial substantial use" in another dealer's service territory, the selling dealer is required to return the 5% to Caterpillar. Caterpillar then distributes the 5% to the servicing dealer, provided that the servicing dealer submits an appropriate claim. This pay-

---

1. On February 27, 1984, following the Supreme Court's denial of certiorari, the judgment order of the court of appeals, dated July 26, 1983, was filed with the Clerk of this court. That judgment order reversed the prior order of this court, and remanded the case for further proceedings consistent with the court of appeals' opinion. Accordingly, plaintiffs' claims for monetary damages under § 4 of the Clayton Act will be dismissed.

ment is known as an interterritorial service fee.

Prior to 1978, Caterpillar had a practice of returning the fee to the selling dealer if no servicing dealer presented a claim. Many selling dealers simply transferred the service fee directly to the servicing dealer, and retained the service fee if they knew that no claim would be made. A dealer selling to an independent marketer that resold the generator set and provided its own servicing could be assured that no· claim for the service fee would be made. Consequently, that selling dealer could pass on some or all of the 5% as a price reduction to the buyer.

In July, 1978, Caterpillar began to insist that its dealers comply with the distribution agreement and return the service fee as soon as it became known that the generator set would receive its initial substantial use outside of the seller's service territory. Caterpillar would then hold the fee for a year, and return it to the selling dealer if no claim was made. In February 1980, Caterpillar implemented a policy whereby it no longer returned the service fee to the selling dealer, but instead kept all unclaimed fees as miscellaneous income. The practical result of this modified system was to prevent selling dealers from passing on all or part of the service fee as a price reduction to marketers who intended to resell and service the generator sets outside of the selling dealers' service territory.

Plaintiffs are general trading companies that at one time bought Caterpillar electrical generator sets from an authorized Caterpillar dealer in the United States, Ohio Machine Company (OMCO), and sold those sets abroad, primarily in Saudi Arabia. Plaintiffs' principal customer for Caterpillar generator sets in Saudi Arabia was Rabiah and Nasser Co. (Ranco), which in turn sold the sets to various Saudi buyers. Plaintiffs also performed necessary delivery, installation, inspection and warranty service for users of Caterpillar generator sets in Saudi Arabia. Plaintiffs sold and serviced the Caterpillar sets in competition with certain authorized Caterpillar dealers, particularly Zahid Heavy Tractor Co. Ltd. (Zahid) of Saudi Arabia. Plaintiffs assert that Caterpillar's modification of its system for collecting the 5% service fee imposed a penalty on all sales to plaintiffs and other independent marketers, and that this penalty was designed specifically to eliminate such marketers as a source of competition to Zahid and other authorized Caterpillar dealers. In the fall of 1981, about a year and a half after Caterpillar modified this service fee system, plaintiffs ceased marketing Caterpillar electrical generator sets, and transferred their generator set business to OMCO.

*Caterpillar's Motion for Summary Judgment.*

Caterpillar contends that plaintiffs' claim for injunctive relief is moot because plaintiffs have been out of the business of marketing Caterpillar electrical generator sets for nearly three years. Plaintiffs acknowledge that they no longer market Caterpillar sets, but assert that they were driven out of the market by Caterpillar's service fee penalty and that removal of the penalty would permit them to reenter the market and compete as they once did. Caterpillar responds that certain changes in Saudi Arabian law subsequent to the cessation and sale of plaintiffs' generator set business now preclude plaintiffs from returning to this principal former market. These changes are embodied in Royal Decree No. M/32 dated 10/8/1400 H. (June 23, 1980) (Royal Decree M/32), and Ministry of Commerce Order No. 1897 dated 24/5/1401 H. (March 30, 1981) (Ministerial Decision 1897). Plaintiffs dispute Caterpillar's interpretation of these changes, and contend that these changes do not prevent plaintiffs from returning to their former business if Caterpillar's service fee penalty is enjoined. Plaintiffs' claim for injunctive relief thus turns in the first instance on the interpretation of Royal Decree M/32 and Ministerial Decision 1897.

■ Federal Rule of Civil Procedure 44.1 governs the procedure for determining an issue of foreign law. Rule 44.1 states:

A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed.R.Civ.P. 44.1. Defendants provided the requisite notice of their intent to raise an issue concerning Royal Decree M/32 and Ministerial Decision 1897 in a pleading entitled "Notice of Matter Concerning Foreign Law." Both sides then submitted translations of the relevant Saudi Regulations, affidavits from experts on Saudi law,[2] and other materials in support of their respective positions.

The parties rely primarily on the expert affidavits in advancing their suggested interpretations of Royal Decree M/32 and Ministerial Decision 1897. All of the affiants profess a familiarity with the interpretation and application of Royal Decree M/32 and Ministerial Decision 1897. Not surprisingly, the experts disagree as to the scope of those laws. Because this court's determination is treated as a ruling on a question of law, however, this disagreement on the part of the experts would not foreclose the granting of a motion for summary judgment. *Alosio v. Iranian Shipping Lines, S.A.,* 426 F.Supp. 687, 689 (S.D.N.Y.1976), *aff'd,* 573 F.2d 1287 (2nd Cir.1977).

Royal Decree M/32 essentially is the Saudi equivalent of enabling legislation, and it enables the Saudi Ministry of Commerce to promulgate revisions to the Saudi Commercial Agencies Regulations. Saba Affidavit, ¶ 4. One such revision is Ministerial Decision 1897, which provides "Implementation Rules" for the Commercial Agencies Regulations. These Implementation Rules became effective on May 17, 1981. Saba Affidavit, ¶ 6; First Al-Hejailan Affidavit, ¶ 7. Decision 1897 states in pertinent part:

> "Commercial Agencies" under the Commercial Agencies Regulations and its amendments mean any person who enters into a contract with a producer or his representative, in his country to carry on business whether as an agent or distributor in any type of agency or distribution for a profit, a commission or facilities of whatever nature, including agencies for sea, air and land transportation and any agencies for which an order is issued by the Minister of Commerce.
>
> . . . .
>
> No person other than a Saudi, whether natural or juridical, may be a commercial agent in the Saudi Arabia Kingdom. However, Saudi companies must have fully Saudi capitalization and their boards of directors and officers and those who have the right to sign on their behalf must be Saudis.

Implementation Rules for Commercial Agencies Regulations, Ministry of Commerce Order No. 1897 of 25/5/1401 H. (March 30, 1982), articles 1 & 2.[3]

---

**2.** Caterpillar provided affidavits from Joseph Saba and M. Taher Helmy. Mr. Saba is a member of the bar of the District of Columbia who presently resides in Riyadh, Saudi Arabia. Saba Affidavit, ¶¶ 1–2. Although Mr. Saba is not licensed to practice in Saudi Arabia, he acts as a managing partner for a law firm in Riyadh, and serves on the editorial board of a publication that analyzes the laws and regulations of various Middle Eastern Nations. *Id.* Under Rule 44.1, an expert need not be admitted to practice in the country whose law is at issue. *Murphy v. Bankers Commercial Corp.,* 111 F.Supp. 608, 611 (S.D.N.Y.), *aff'd,* 203 F.2d 645 (2nd Cir.1953). Mr. Helmy is a member of the bars of Illinois, Saudi Arabia, and Egypt, and he practices general international law in Riyadh. Helmy Affidavit, ¶ 1.

Plaintiffs submitted two affidavits from Salah Al-Hejailan. Mr. Al-Hejailan is a member of the Saudi Arabian bar, and he maintains a private practice in Riyadh. First Al-Hejailan Affidavit, ¶ 1 (filed June 14, 1984).

**3.** Each party has submitted a translation of Decision 1897. Plaintiffs' translation is attached to the first affidavit of Mr. Al-Hejailan, and Caterpillar's translation was received from the Saudi Arabian Embassy in Washington, D.C. Although neither translation apparently is official, the parties do not dispute the wording of the regulation. For present purposes, I have chosen

Mr. Saba states that Decision 1897 imposes certain specific requirements on parties who wish to act as a distributor or agent in Saudi Arabia for a foreign manufacturer. First, those parties must register with the Saudi Ministry of Commerce as a foreign manufacturer's agent or distributor. Second, those parties must be Saudi nationals or one hundred percent Saudi entities. Third, those parties must have entered into a distributorship agreement or other agency agreement directly with the foreign manufacturer or the manufacturer's duly authorized representative, and such agreement must be registered with the Ministry of Commerce. Saba Affidavit, ¶¶ 7, 9, 10. In addition, Decision 1897 requires that the Saudi agent or distributor maintain service facilities and an adequate supply of spare parts, and also that he respect the terms and conditions of the warranties provided by the foreign manufacturer. Saba Affidavit, ¶ 11.

Caterpillar concludes from Mr. Saba's affidavit that Decision 1897 bars plaintiffs from marketing Caterpillar generator sets in Saudi Arabia because plaintiffs are not authorized Caterpillar dealers, and, consequently, are not able to enter into an authorized distributorship or agency agreement with their Saudi purchasers. In addition, Caterpillar notes that plaintiff left the Caterpillar electrical generator set business by selling the business to OMCO, an authorized Caterpillar dealer, approximately four months after Decision 1897 took effect.[4] Caterpillar thus raises an inference that plaintiffs left the market in Saudi Arabia in direct response to the change in Saudi law, and not as a result of Caterpillar's service fee change.

Plaintiffs dispute the conclusions Caterpillar draws from the Saba affidavit. Plaintiffs contend that all commercial relationships between foreign suppliers and Saudi purchasers need not take the form of a

formal distributorship or agency relationship. Rather, plaintiffs suggest that Decision 1897 merely sets guidelines for distributor or agency relationships if the Saudi purchaser desires such a relationship. According to plaintiffs' position, these guidelines do not prevent Saudi purchasers who do not wish to enter into a formal distributorship or agency relationship from purchasing foreign goods from an independent middleman or reseller. Plaintiffs support this interpretation with the affidavit of Mr. Al-Hejailan. Mr. Al-Hejailan states:

9. Neither the Commercial Agency Regulations nor the Implementation Rules require that a Saudi person register as the commercial agent or distributor of a foreign manufacturer as a prerequisite to engaging in the importation and sale in Saudi Arabia of such foreign manufacturer's goods.

10. The Commercial Agency Regulations and Implementation Rules do not require that a Saudi importer buy his stock either directly from a foreign manufacturer or the manufacturer's representative, and a Saudi importer is free to purchase the foreign manufacturer's products from third parties without any relationship to the manufacturer.

11. The Commercial Agency Regulations and the Implementation Rules do not require that a Saudi person register as a commercial agent or distributor of a foreign manufacturer to purchase, import and sell such manufacturer's products, and such activity is not contrary to Saudi law even if the foreign manufacturer has a registered commercial agent or distributor in Saudi Arabia.

First Al-Hejailan Affidavit, ¶¶ 9–11.

Plaintiffs conclude from Mr. Al-Hejailan's affidavit that if Caterpillar's service fee penalty is eliminated, plaintiffs will not be barred by Decision 1897 from returning to their previous business of marketing

---

to use the wording contained in the translation supplied to Caterpillar by the Saudi Arabian Embassy.

**4.** Decision 1897 provides a one year grace period for agents and distributors that were in business at the time the decision became effective. Ministerial Decision 1897, article 22; Saba Affidavit, ¶ 12. Consequently, the regulations would not have applied to plaintiffs until May 17, 1982.

Caterpillar electrical generator sets as a reseller in Saudi Arabia. Plaintiffs bolster this conclusion with the affidavit of Washburn S. Oberwager, the president of Merican, Inc. and Merican Curtis, Inc. Mr. Oberwager states that despite Decision 1897, plaintiffs have continued to market various other types of foreign manufactured goods, including heavy equipment, in Saudi Arabia, in the same manner that they marketed Caterpillar generator sets prior to 1981. Mr. Oberwager concludes from his practical perspective that the change in Caterpillar's service fee system, and not the change in Saudi law, caused plaintiffs to cease marketing Caterpillar generator sets. Oberwager Affidavit, ¶¶ 2–8. Caterpillar responds with the affidavit of Mr. Helmy. Mr. Helmy states that the statements contained in the Al-Hejailan affidavit are incomplete and inconsistent with the policy position of the Saudi Ministry of Commerce. Mr. Helmy declares that some members of the Saudi legal community have been of the opinion that a Saudi purchaser may import goods from a foreign supplier without having to register the importation agreement, but only when such importation takes place on an ad hoc or intermittent basis. When the relationship between the foreign supplier and the Saudi importer begins to take on a more continuous nature, and thus more closely resembles the distribution of a foreign manufacturer's product, Decision 1897 requires the Saudi importer to obtain an acceptable distribution or agency agreement directly with the foreign manufacturer or the manufacturer's authorized representative, and register the agreement with the Saudi Ministry of Commerce. Helmy Affidavit, ¶¶ 4–10.

In addition, the Helmy affidavit contains a letter that the Saudi Ministry of Commerce has prepared in blank for routine distribution in response to inquiries concerning the scope of Decision 1897. The letter states in pertinent part:

First: This Ministry, or naturally, any other entity has no right to enforce any provision of the Commercial Agencies Regulations, as amended, and its implementing regulations against any foreign person (entity) not residing in the Kingdom nor has business transactions to be performed within its territory.

Second: If, however, there is *a business transaction, whatever its contractual characterization may be* (agency-distributorship-importation) and the Kingdom was the place of performance of the contract, there are certain conditions stated hereunder that have to be met (in the agency contract).

1. The relationship should be direct *without any intermediary* between the foreign producer and/or who represents him in his country on one hand—and the Saudi agent, distributor or importer on the other.

Helmy Affidavit, attachment (emphasis added). Caterpillar contends that this letter represents the policy position of the Ministry of Commerce and reveals an intention to apply the requirements of Decision 1897 broadly to all business transactions between a foreign entity and a Saudi purchaser. Such a broad application would require the registration of agreements even for ad hoc or intermittent sales to Saudi Arabia.

Plaintiffs then submitted a second affidavit from Mr. Al-Hejailan. The second Al-Hejailan affidavit disputes the legal basis for Mr. Helmy's position, and declares that the Ministry of Commerce letter attached to Mr. Helmy's affidavit does not constitute official correspondence because it is undated and bears no Ministry of Commerce reference number. Second Al Hejailan Affidavit, ¶¶ 5–6. Mr. Al-Hejailan also states his opinion that the Saudi Commercial Agencies Regulations "should not be used by foreign manufacturers or local businessmen to reduce competition and injure the Saudi Arabian consumer." *Id.* at ¶ 8.

As the foregoing discussion illustrates, the parties' submissions basically amount to a partisan "battle of experts" over the

scope of Decision 1897.[5] Neither party has submitted a clearly authoritative Saudi pronouncement on the scope of the rule. Rather, in keeping with their respective interest in the litigation, plaintiffs offer a narrow, formalistic interpretation of Decision 1897, while Caterpillar advances a broad, functional approach to the rule. Under plaintiffs' interpretation, the requirements of Decision 1897 apply only to commercial arrangements that already characterize themselves as distributorship or agency agreements. Under Caterpillar's approach, the requirements of Decision 1897 govern any commercial arrangement that results in the importation or distribution of foreign-manufactured goods in Saudi Arabia, without regard to the formal characterization of such arrangements, and the requirements dictate that such arrangements take the form of a distributorship or agency agreement directly between the foreign producer and the Saudi purchaser.

It is my opinion that Saudi Arabia would subscribe to the interpretation that Caterpillar advances. First, Caterpillar's interpretation is consistent with the position stated in the Ministry of Commerce letter attached to the Helmy affidavit. Although this letter apparently is not official, it nonetheless is probative in revealing the Ministry of Commerce's interpretation of the scope and application of Decision 1897. The letter states on its face that whenever a business transaction takes place with a foreign entity, regardless of the characterization of the contractual relationship, and the place of performance of the contract is Saudi Arabia, the contractual relationship should be directly between the Saudi purchaser and the foreign manufacturer or the manufacturer's authorized distributor. The language of the letter expressly excludes business transactions that involve an intermediate party.

Second, Caterpillar's interpretation is consistent with that of a recent commentary on Decision 1897. *See* Cartwright, *The*

*New Saudi Commercial Agencies Regulation*, 16 Int'l Law. 443 (1982). The Cartwright article is not necessarily more authoritative than the expert affidavits submitted to the court, but it nonetheless is important as an English language interpretation of Decision 1897 that is not in any way colored by the adversarial context of the present litigation. Mr. Cartwright states:

> Royal Decree M/32 and the Implementing Regulations, like the commercial agencies laws of several other countries in the Middle East, including Egypt, Jordan and Qatar, seem to require that Saudi commercial agency arrangements be concluded by the Saudi agent directly with the foreign producer, *or* a representative of the producer located in the producer's own country. This provision undoubtedly represents an effort to prohibit (by making non-registrable) agreements between Saudi agents and regional agents or distributors or other "middlemen," whose role, in the view of the Saudi government, makes the goods or services the subject of the agency unduly expensive locally, by the factor of the middleman's markup or commission.

*Id.* at 445. Mr. Cartwright thus interprets Decision 1897 to prohibit the type of reselling arrangement that formed the basis of plaintiffs' Caterpillar generator set business.

Third, Caterpillar's interpretation is consistent with the identifiable policies underlying Decision 1897. From the face of the regulation, as well as the Helmy affidavit, it is apparent that the regulation requiring Saudi purchasers to deal directly with the foreign manufacturers or the manufacturer's authorized representatives is designed to insure a sufficient flow of spare parts, service, and warranty protection to the ultimate Saudi consumers. Decision 1897, article 3; Helmy Affidavit, ¶ 9. The Cartwright article suggests that the regulation also is designed to avoid the price markup

---

**5.** *See generally* Merryman, *Foreign Law as a Problem*, 19 Stan.J.Int'l L. 151, 157–59 (a number of pressures tend to result in an expert on foreign law becoming a partisan advocate for the client whose counsel engages him).

associated with a middleman's commission. These policies would be frustrated entirely if Saudi distributors were able to contract freely with independent resellers and not register their importation agreements with the Ministry of Commerce. Decision 1897 inherently manifests a judgment on the part of the Saudi government that direct distribution relationships, monitored through the registration of the distribution agreements, serve the needs of the Saudi consumer for spare parts, service and warranty protection better than an open market that includes unauthorized resellers and middlemen. Notwithstanding plaintiffs' apparently good record of providing such parts, service, and warranties during their history as resellers of Caterpillar generator sets, Decision 1897 now excludes plaintiffs, as resellers, from the registered marketplace.

Finally, the statements of Mr. Oberwager that plaintiffs market and resell other types of foreign manufactured goods in Saudi Arabia is not persuasive support for plaintiffs' narrow construction of Decision 1897. Plaintiffs' present activities may simply reflect their short term success at eluding the Ministry of Commerce's registration and enforcement efforts. This conduct would not justify permitting plaintiffs to expand their unauthorized activity by distributing Caterpillar generator sets as well.

Decision 1897 requires at least that a continuous distribution of a foreign manufacturer's goods take the form of a formal, registered distribution or agency relationship between the Saudi purchaser and the foreign manufacturer or the manufacturer's authorized representative. In the years 1980 and 1981 plaintiffs marketed over 500 Caterpillar generator sets to Ranco in Saudi Arabia. This continuous distribution of Caterpillar sets would fall within the confines of Decision 1897 if plaintiffs returned to such activity today. Because plaintiffs are not authorized representatives of Caterpillar, they are presently barred by Decision 1897 from returning to their former business as resellers of Cater-

pillar generator sets. Caterpillar's change in its fee service system, therefore, even if it unlawfully penalized plaintiffs in the past, does not support present injunctive relief, because plaintiffs can no longer compete with Caterpillar in their principal former market, Saudi Arabia. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974). Because of Decision 1897, there are no continuing, present adverse effects to plaintiffs resulting from Caterpillar's change in their service fee system. Consequently, plaintiffs' claim for injunctive relief no longer presents a live case or controversy. Plaintiffs' claim for injunctive relief, therefore, will be dismissed.

### Plaintiffs' Motion for Leave to Amend.

Plaintiffs seek leave of this court to file a second amended complaint. The proposed amendment basically retains the factual allegations of plaintiffs' previous complaints, but includes an additional claim for damages under the state common law of civil conspiracy. Caterpillar objects to the proposed amendment as an untimely and prejudicial attempt to revive plaintiffs' dismissed antitrust damage claim.

Rule 15(a) of the Federal Rules of Civil Procedure provides this court with the discretion to grant or deny leave to amend a pleading. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971). The rule, however, advises that "leave shall be freely given when justice so requires," Fed. R.Civ.P. 15(a), and, in general, courts liberally permit parties to amend their pleadings. *See Boileau v. Bethlehem Steel Corp.*, 730 F.2d 929, 938 (3rd Cir.1984). Despite this general liberality, the Supreme Court has enumerated specific factors that may justify the denial of leave to amend. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). These factors include "undue delay, bad faith or

dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, [and] futility of amendment." *Foman,* 371 U.S. at 182, 83 S.Ct. at 230.

There is no question that plaintiffs substantially delayed the filing of the proposed amendment. The common-law conspiracy claim that plaintiffs seek to assert was available to them at the time they filed their original complaint, because the conspiracy claim admittedly is based upon the same factual allegations that underlie plaintiffs' federal antitrust claims. Nevertheless, plaintiffs did not move for leave to amend their complaint to include the common-law conspiracy claim until December of 1983.[6] That date is over three years after plaintiffs filed their original complaint, almost two and a half years after they filed their first amended complaint, over a year and a half after Caterpillar moved to dismiss the federal antitrust damage claim, and over four months after the court of appeals handed down the opinion holding that plaintiffs' antitrust damage claim is barred by the doctrine of *Illinois Brick.*

■ The mere existence of delay, however, is an insufficient basis for denying a proposed amendment. *Cornell & Co. v. Occupational Safety & Health Review Commission,* 573 F.2d 820, 823 (3rd Cir. 1978). Rather, the moving party's delay must be coupled with an additional consideration, such as prejudice to the opposing party, before a court may deny leave to amend. *Boileau,* 730 F.2d at 939; *Johnson v. Trueblood,* 629 F.2d 287, 294 (3rd Cir.1980). Indeed, prejudice to the non-

moving party is considered the "touchstone" for the denial of leave to amend. *Cornell,* 573 F.2d at 283. As a practical matter, the longer the moving party delays in seeking leave to amend, the more likely it is that the nonmoving party has suffered prejudice in some way. *See Advocat v. Nexus Industries, Inc.,* 497 F.Supp. 328, 331 (D.Del.1980).

■ Allowing plaintiffs to amend their complaint to include a claim for common-law conspiracy would result in substantial prejudice to Caterpillar, the nonmoving party. The court of appeals has defined prejudice under Rule 15 to mean "undue difficulty in prosecuting a lawsuit as a result of a change in tactics or theories on the part of the other party." *Deakyne v. Commissioners of Lewes,* 416 F.2d 290, 300 (3rd Cir.1969). Caterpillar already has expended a significant amount of time and resources defending this case as an antitrust matter. Should this case go forward with plaintiffs' proposed amendment, Caterpillar will be forced to expend additional time and resources in litigation.

To begin with, Caterpillar would be required to defend this action under an entirely new and different theory of liability. The court of appeals' opinion on the *Illinois Brick* issue forecloses plaintiffs from pursuing their claim for damages under the federal antitrust laws. In the foregoing section of this opinion, I have held that plaintiffs' claim for injunctive relief under the federal antitrust laws does not present a justiciable case or controversy. Indeed, plaintiffs' claim for injunctive relief has not been live since plaintiffs sold their Caterpillar electrical generator set business in 1981. If plaintiffs are permitted to amend

**6.** By way of explanation, the sequence of events following the plaintiffs' filing of their motion for leave to amend took place as follows: The parties stipulated to a deferral of Caterpillar's response to plaintiffs' motion and the filing of Caterpillar's motion to dismiss plaintiffs' claim for injunctive relief until after the Supreme Court issued its final order on plaintiffs' petition for a writ of certiorari regarding the *Illinois Brick* issue. The Supreme Court denied certiorari on February 21, 1984. Caterpillar then filed its motion for summary judgment on

March 9, 1984, and its response to plaintiffs' motion for leave to amend on March 23, 1984. Thereafter, the parties submitted an extensive series of briefs, reply briefs, affidavits and other materials on the Saudi law issue involved in Caterpillar's motion for summary judgment. I allowed this briefing to continue up to a point because of my desire to receive and utilize relevant source materials on that issue of unfamiliar foreign law. My desire to address both motions together necessitated the delay in disposing of plaintiffs' motion for leave to amend.

their complaint, this action, which is almost four years old, will be transformed completely into a state common-law conspiracy action. The amendment would require Caterpillar to engage in additional, and possibly duplicative, discovery, and would necessitate a lengthy and complicated trial. *See Kuhn v. Philadelphia Electric Co.,* 85 F.R.D. 86 (E.D.Pa.1979) (potential for lengthier and more complicated trial sufficient reason to deny leave to amend). Such a fundamental change in the nature of this litigation, particularly after plaintiffs' original claim for damages has been rejected, frustrates even the liberal rules of notice pleading and is unduly prejudicial to Caterpillar. *Zinser v. Continental Grain Co.,* 660 F.2d 754, 762 (10th Cir.1981) (plaintiff denied leave to amend complaint to assert claims of fraud, deceit and civil conspiracy after court had ruled that *Illinois Brick* bars plaintiff's antitrust claims).

In addition, Caterpillar would be exposed to the danger of duplicative recovery and the uncertainties associated with the complex apportionment of damages. The court of appeals already has addressed these concerns in the factual context of this case, and has held that they justify barring a claim for damages under the federal antitrust laws. *Merican,* 713 F.2d at 968–69. Permitting plaintiffs to reassert a damage claim by employing a theory of civil conspiracy would reopen the door to duplicative recovery and complicated proof of damages and undermine the sound policies articulated and applied by the court of appeals. The prejudice to Caterpillar would be manifest.

The court of appeals held that the district court "erred by refusing to grant Caterpillar's motion to dismiss Appellees' [plaintiffs'] claims for damages." *Merican,* 713 F.2d at 960. Despite this clear mandate, plaintiffs' seek to avoid dismissal of their claim for damages by asserting, upon the same factual allegations, a cause of action for common-law civil conspiracy, rather than the previously asserted antitrust viola-

tions. The court of appeals in *Boileau,* 730 F.2d at 939 stated that "it is within the discretion of a trial judge to prevent the abusive use of amendment to delay or prolong litigation." Clearly, the only reason for the delay in seeking to amend was because plaintiffs were relying solely on their antitrust claim, and when that claim was finally ordered to be dismissed and certiorari denied by the Supreme Court, plaintiffs made a last-ditch effort to resuscitate their claims by asserting, on the same facts, an entirely new and distinct cause of action.

From the submitted briefs, it is quite apparent that over the intervening years, many documents that would be relevant have become unavailable. Many documents that were at one time maintained by plaintiffs' Saudi facility can no longer be located. Witnesses who were at one time employed by plaintiffs are no longer in their employ, and, thus, it may be impossible for defendants to secure their testimony. *See* Caterpillar Tractor Co.'s Memorandum in Opposition to Plaintiffs' Motion for Leave to File a Second Amended Complaint at 15–20.

The motion for leave to file a second amended complaint will be denied. Considering all of the circumstances of this case, to grant such a motion at this time, although within the discretion of the district court, might well constitute an abuse of discretion. In any event, in the exercise of discretion, I will deny the motion to amend the complaint.