**KOREA LIFE INSURANCE CO., LTD. and Morning Glory Investment (L) Limited, Plaintiffs,**

v.

**MORGAN GUARANTY TRUST COMPANY OF NEW YORK, Defendant.**

**No. 99 Civ.12175 AKH.**

United States District Court, S.D. New York.

July 1, 2003.

John David Lovi, McDermott, Will & Emery, New York City, for Plaintiffs.

Robert H. Baron, Frederick AO Schwartz, Jr., Gravath, Swaine & Moore, LLP, New York City, for Defendant.

## *OPINION AND ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANT, DISMISSING COUNTS ONE, TWO, THREE, FIVE, AND SIX; AND GRANTING SUMMARY JUDGMENT TO PLAINTIFFS ON COUNT FOUR*

HELLERSTEIN, District Judge.

This is a case of disappointed expectations. It involves forward, one-year contracts in foreign currencies, elaborate hedges, and a substantial, unhedged risk of depreciation of one of the currencies, the

Thai baht. The real parties in interest are a Korean life insurance company--the oldest and third largest in Korea--and a major investment bank. The transactions they made were filtered through their specially created, offshore entities, and documented by fragmented and complicated instruments, intended to disguise their dealings from Korean regulators. As it happened, the unhedged risk came to pass, an extraordinary loss occurred, and the Korean life insurance company honored its resulting debt. It brought this lawsuit to obtain the return of its payment.

In January 1997, an affiliate of Morgan Guaranty Trust Company of New York ("Morgan") raised $25 million of debt from European lenders for the purpose of providing an opportunity for an above-market return to benefit plaintiff, Korea Life Insurance Company ("Korea Life" or "KLI"). Korea Life, however, was not to be the direct recipient or custodian of the funds. The deal involved special purpose entities that were to be formed in off-shore jurisdictions, to handle and deploy the Morgan-raised funds and to mask the transaction from Korean regulators.

Morgan's affiliate promised to repay the $25,000,000 to the European investors after one year, with interest at the London Interbank Offered Rate ("LIBOR"). During the year, a special purpose entity ("SPE") that Korea Life was to create would have the use and benefit of the funds, in order to purchase a dollar-denominated certificate of deposit. At the end of the year, at maturity, Korea Life's SPE was to repay Morgan according to formulae reflecting changes in the ratios among the dollar, the Thai baht, and the Japanese yen. If the baht and the yen appreciated against the dollar, KLI would be responsible for less than the $25,000,000 it owed to Morgan, and might not have had to pay Morgan at all. However, if the baht depreciated, Korea Life's SPE would have to pay Morgan five times the deteriorated rate of the baht relative to the dollar, plus the discount of $25,000,000. Since Korea Life's SPE had no capital aside from the $25,000,000 that had been lent to it, Korea Life promised to contribute the capital that might be needed to repay Morgan.

As it turned out, the Thai baht collapsed during the investment year. Korea Life, honoring its commitment, paid Morgan, in cash and credit, $66,304,746, plus the agreed-to discount of $25 million--approximately $90,487,500 in all. It brought this lawsuit to regain all or part of its payment. Its claim, essentially, is for money unlawfully had and received by Morgan, because of its alleged fraud or, alternatively, negligent misrepresentations, the illegality or ultra vires nature of the transactions and their violation of New York's anti-gambling statutes, the commercial impracticability of the transactions, or Morgan's unjust enrichment. Korea Life also claims that Morgan breached a clause in the agreement which required it to unwind the transaction upon demand by Korea Life's SPE, thus preventing Korea Life from mitigating its losses according to the stop-loss feature of the agreement.

After extensive discovery conducted in three continents, Morgan moves for summary judgment. Both sides have submitted extensive affidavits and briefs, and I have engaged the parties in several arguments, evidentiary hearings, and supplemental submissions on the topics of Korean law and the notice that was given pursuant to the unwind provision in the agreements.[1] I now rule in this opinion

---

1. I heard oral argument on June 20 and July 29, 2002, and conducted evidentiary hearings on September 4 and 5, 2002.

on all issues, dismissing all but the breach of contract count against Morgan, and granting Korea Life summary judgment on that breach of contract count in an amount to be determined in further proceedings.

## THE EVIDENTIARY RECORD

### A. The Parties

Plaintiff KLI is Korea's oldest and third-largest life insurance company. It was organized in 1946 under the laws of the Republic of Korea. As of March 30, 1996, it had more than $12 billion in assets and $8 billion in revenue. Its net equity was $48 million. In March 1999, it entered receivership, under the supervision of the Korean government.

Plaintiff Morning Glory Investment (L) Limited ("Morning Glory") is a limited liability investment company. KLI created Morning Glory under the laws of Malaysia on November 27, 1996, as its special purpose entity to engage in the transactions at issue.

Defendant Morgan is a commercial bank incorporated under the laws of the State of New York, with its principal place of business in New York City.

### B. The Morning Glory Transactions

On January 15, 1997, a series of agreements were executed, providing for the money flow just described. As step one, Morgan set up a special purpose entity in the English Channel islands, Frome Company Limited ("Frome"). By a private placement memorandum dated January 15, 1997,[2] Frome issued one-year notes to European investors, raising $25 million. The notes were guaranteed by Morgan,[3] and promised the lenders repayment with interest at LIBOR.[4]

As step two, Frome contributed the $25 million it raised to Morning Glory, in exchange for 2.5 million of Morning Glory's common shares. Simultaneously, Morning Glory purchased a one-year $25 million certificate of deposit issued by Korea Exchange Bank ("KEB"), maturing in one year and paying interest at 6.05 per cent, and paid a fee of $70,000 to KEB.

The next steps were to occur a year later, at maturity, January 30, 1998. Morning Glory was entitled to receive $26,512,500 in principal and interest on the certificate of deposit issued by Korea Exchange Bank, and obligated to redeem its shares that it had issued to Frome by paying Frome's parent, Morgan either (a) 96.75 per cent of the $25 million Frome had contributed, that is, $24,187,500 or, (b) depending on conditions relating to the rise or fall of the Thai baht in relation to the Japanese yen, the agreed-to discount of $25 million, plus or minus the product of two inter-related formulae quantifying those currency relationships. The formulae were set out in two Total Return Swap Confirmation Agreements, one between Morning Glory and KEB ("the Morning Glory/KEB agreement"), and the other between KEB and Morgan ("the KEB/Morgan agreement"). The same formulae are used in both agreements, and in this way the agreements work in tandem so that

---

**2.** The memorandum bears the date of January 15, 1996. The context makes clear that the actual date was January 15, 1997.

**3.** The guaranty was in the form of a swap agreement between Frome and Morgan. Morgan agreed to provide funds to Frome adequate to repay its obligations under the notes. Frome agreed to deliver, in exchange, the 2.5 million shares of Morning Glory acquired in step two of the transaction.

**4.** LIBOR is an acronym for London Interbank Offered Rate. The one-year rate, as of January 15, 1997, was about 5.95 per cent.

any amount Morning Glory was obligated to pay to KEB under the Morning Glory/KEB agreement, KEB would owe to Morgan under the KEB/Morgan agreement. Likewise, any amount Morgan would be obligated to pay to KEB under the KEB/Morgan agreement, KEB would in turn owe to Morning Glory under the Morning Glory/KEB agreement. KEB, in other words, was the intermediary linking the two agreements.

Morning Glory's obligation to pay KEB at the January 30, 1998 maturity date, and KEB's obligation to pass through that amount to Morgan, was expressed in the formulae as a "Yen Payment Amount" and a "Baht Payment Amount." The formulae took into account five conditions: an appreciating, and a depreciating, yen relative to the dollar; an appreciating, and a depreciating, baht relative to the dollar; and a fixed ratio of yen to baht of one-to-five. If the yen depreciated, Morgan would be obligated to pay KEB, and KEB to pay Morning Glory, an amount provided for by the formulae, but if the yen appreciated, no amount would have to be paid by any party. If the baht depreciated, Morning Glory would be obligated to pay KEB, and KEB to pay Morgan, an amount provided for by the formulae, but if the baht appreciated, Morgan would have to pay KEB, and KEB, in turn, Morning Glory, an amount calculated according to the formulae, but not more than $25 million.

How did these formulae work together? The formulae were calculated on the basis of the relationship between the baht and the yen, which tended to travel together. Historically, when the yen appreciated, the baht appreciated, and when the yen depreciated, the baht depreciated, generally at a ratio of about five baht to one yen. Taking this relationship into account, the formulae were structured so that the yen would ostensibly function as a hedge against the baht. According to these formulae, if, at maturity, the yen and the baht both depreciated, Morning Glory was obligated to pay a "Baht Payment Amount" to KEB, and KEB was obligated to pay the same amount to Morgan, but at the same time, Morgan was obligated to pay KEB, and KEB to pay Morning Glory, a "Yen Payment Amount," serving as a hedge to Morning Glory's risk. The relationship between these amounts reflected the five-to-one ratio: the "Baht Payment Amount" was equal to the absolute value of $125 million times the difference between the value of the baht as provided in the agreement and the value of the baht on the maturity date, divided by the value of the baht on the maturity date, while the "Yen Payment Amount" was equal to the value of $25 million (1/5 of $125 million) times the difference between the value of the yen on the maturity date and the value of the yen as provided in the agreement, divided by the value of the yen on the maturity date.[5] Thus, if the baht and yen both depreciated at the historical five-to-one ratio, Morning Glory would owe money to KEB, and KEB to Morgan, but any amount owed would be cancelled out by the amount Morgan owed to KEB, and KEB to Morning Glory.

If, however, the yen and the baht, instead of depreciating, were both to appreciate, a different scheme was to govern. If the yen were to appreciate, no payment

---

5. These formulae are represented in the agreements as:

Yen Payment Amount = Notional Amount × (YenMat—YenSpot)/YenMat
Baht Payment Amount = Notional Amount × 5 × (ThbSpot—ThbMat)/ThbMat

The "Notional Amount" was designated as $25,000,000; the "YenMat" and "ThbMat" the value of the yen and baht, respectively, at maturity; the "YenSpot" was designated as 116.00; and the "ThbMat" was designated as 25.624.

obligation would be due from either party to the other. But if the baht were to appreciate, Morgan would have to pay KEB, and KEB, in turn, would have to pay Morning Glory an amount proportional to the baht's appreciation, up to $25,000,000. In other words, Morning Glory stood to gain by the baht's appreciation: (a) the interest gain on the one-year certificate of deposit ($25,000,000 × .0605), less Morning Glory's fees to KEB ($70,000), plus (b) the repayment discount ($25,000,000 × .0325), or $2,255,000, plus (c) an uncertain amount, up to $25,000,000, according to how much the baht might appreciate against the dollar. Thus, if the baht would be worth more against the dollar on January 30, 1998 (the maturity date) than it was worth as designated in the agreements, Korea Life might find that some or all of its repayment obligation of $25,000,000 would be excused. And all this on borrowed funds and without any commitment of capital.

There was a catch, however. If the baht depreciated during the investment year, and the yen remained stable against the dollar or appreciated, there would be no hedge. Morning Glory's obligation to pay KEB, and KEB's obligation, in turn, to pay Morgan was "absolute."

The Morning Glory/KEB Total Return Swap Agreement contained a clause, clause 2(e), to guard against that contingency of a depreciating baht losing its historically-fixed ratio of five-to-one against the yen. Under clause 2(e), Morning Glory was given the right to demand, upon two days' written notice, that its forward position be unwound.[6]

To recapitulate and elaborate: Under the Total Transaction Return Swap Transaction agreement at maturity:

(a) Morning Glory was to receive interest at the rate of 6.05 per cent of $25,000,000, in the amount of $1,512,500; plus a discount of its repayment obligation at the rate of 3.25 per cent of $25,000,000, in the amount of $812,500; less $70,000 in a fee to KEB; or a total interest rate profit, in dollars, of $2,255,000, plus the possibility of additional gain if the baht were to appreciate in relation to the dollar. Morning Glory, Korea Life's SPE, had this profit possibility on the basis entirely of borrowed funds, all off-shore and away from the scrutiny of Korea Life's regulators, and without having to commit any capital to the transaction.

(b) If, however, the baht were to depreciate against the dollar, requiring more baht at maturity to purchase a dollar than at inception, Morning Glory was to pay "the absolute value of the Baht Payment." That is, Morning Glory would be required to purchase as many baht as would be required to purchase five times $25,000,000. Furthermore, if it lacked sufficient assets to pay the liability, Korea Life committed by a separate Letter of Commitment to KEB and to Morning Glory that, "subject to any restrictions under Korean Law ... it shall subscribe for, or cause to be subscribed for, additional Shares in the amount sufficient to ... pay all liabilities of [Morning Glory]" to KEB and through KEB, to Morgan. Thus, the real risk inherent in the swap transactions was to be incurred by Morning Glory, if the baht depreciated in value against the dollar.

(c) The Morning Glory/KEB agreement, however, provided a limit to this "absolute" risk. Section 2(e) of that agreement provided that Morning Glory "has the

6. The requirement of a writing was incorporated into the Swap Agreement by reference to another, unexecuted Master agreement, the form provided by the International Swaps and Derivatives Association, Inc. (the "ISDA Master Agreement" or "ISDA form").

right as of any Business Day on a full two-way payments basis to terminate the Transaction at the prevailing market value, as determined by the Calculation Agent in a reasonable and fair commercial manner, on at least two (2) Business Days prior notice." The "Calculation Agent" is defined in the confirmation agreement as Morgan. In other words, Morning Glory had a stop-loss provision, enabling it to demand settlement two days after notice, at any time during the one-year period of the transaction. The counterpart agreement between KEB and Morgan, however, did not contain a like provision, and the parties offered no explanation to account for this omission.

## C. Documents Comprising the Agreement

The two Total Return Swap Transaction confirmation agreements providing the formulae comprising the transaction described above were to be "governed by and construed in accordance with the laws of the State of New York," and were to "supplement, form a part of, and be subject to" a Master Agreement, in the form published by the International Swaps and Derivatives Association, Inc. ("ISDA Master Agreement" or "ISDA form"). The ISDA Master Agreement in use when the Morning Glory Transactions were executed includes an integration clause, providing that the Master Agreement "constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto." The Master Agreement also requires that any notice or other communication be in writing. The parties never actually signed the Master Agreement.

The parties (Morning Glory, KEB and Morgan) also entered into a Security Agreement, and KLI executed and deliv-

ered a Letter of Commitment ("LOC") to Morning Glory and KEB, on January 15, 1997, in connection with the Total Return Swap Agreements. The Security Agreement required Morning Glory to satisfy KEB's obligations under KEB's swap agreement with Morgan. The LOC committed KLI to contribute capital to Morning Glory by purchasing additional of its shares, to the extent Morning Glory could not pay KEB, or if Morning Glory's "Net Asset Value" fell below 100 percent of its liabilities under the swap. KLI represented, in its LOC, that it was "duly incorporated and validly existing under the laws of the Republic of Korea as a limited company, [had] full power, authority and legal right to enter into and perform [its] obligations under this letter and ha[d] taken all necessary action (corporate and otherwise) to authorize the execution, performance and delivery" of the LOC, and that the LOC "ha[d] been duly authorized, executed and delivered by us and constitutes our valid and binding obligation."

All of these documents–the Security Agreement, the LOC, and the Total Return Swap Transaction confirmation agreements–were proceeded by an Indicative Term Sheet, delivered by Morgan and executed by KLI and KEB on January 10, 1997, with KEB acting in the transactions "for and on behalf of Morning Glory Investment Limited." The term sheet set out the transactions that were later separately reflected in the two Total Return Swap Agreements, one between Morning Glory and KEB, and the second between KEB and Morgan; KLI's obligations were later expressed separately in the LOC and the Security Agreement.

## D. Background to the Total Return Swap Agreements

The agreements discussed were entered into after extensive contacts and negotia-

tions between the parties. Early in 1996, Dr. Chang Hyun Chi, an officer of Promax International ("Promax"), a Korean company which marketed and sold Morgan's financial products, approached Chae Wook Noh of KLI to suggest that KLI enter into derivative financial transactions based on "synthetic low-cost yen financing." The idea conveyed by Chi to Noh (from Morgan's agent to KLI) was to simulate a borrowing of yen in order to capture low interest rates charged by Japanese financial institutions, and to use such a borrowing as leverage in purchasing common stocks.

Dr. Chi's proposals evolved from such leveraged stock purchases to currency proposals, and to a yen-financed set of forward contracts for the Thai baht as hedges against possible fluctuations in the yen. Dr. Chi proposed that KLI's investment should amount to $100 million, and suggested that there would be little or no risk involved in the transaction. His expressed assumption was that the Thai baht was a stable currency, tied to other stable currencies at a fixed exchange rate, and that the Thai government and its central banking policies defended that stability by purchases and sales on international currency markets. Dr. Chi proposed that KLI could benefit by a rate of return of as much as 16 per cent, for an investment that was substantially risk-free. Dr. Chi's proposal also recognized that Korea's insurance regulators might look askance at an unconventional investment, not high-grade debt securities that Korean regulatory policies mandated for regulated life insurance companies. Dr. Chi proposed that the transaction need not be disclosed if it was done entirely through off-shore special purpose entities.

The proposal was attractive to Mr. Noh and his colleagues at KLI. KLI would be 50 years old in 1996, and was the oldest,

and the third largest, life insurance company in Korea. Its management in 1996 prided itself on its rapid growth, on a 30.7 percent increase in new business, and a 25.2 percent increase in premium income, compared to the preceding year. It had assets of $12,360,000,000 but liabilities almost as much–$12,312,000,000. Its capital stood at $38 million, but its income was disproportionately low, $7 million for the year ended March 31, 1996, and $8 million the previous year. Its earned surplus as of March 31, 1996 was only $10 million.

KLI's management stated in its annual report for the year ended March 30, 1996 that it sought "maximum return" for policy-holders, and to "guaranty the best and most affluent life possible for [its] clients." However, KLI's annual report also stated that KLI was operating in a field of "boundless competition," as Korea liberalized its financial markets and as "banking, securities firms, investment trust companies and other financial institutions began overlapping with each other," introducing downward pressure on interest rate returns. Clearly, such downward pressure could frustrate the goals expressed by KLI management.

Hence, Dr. Chi's proposals to Mr. Noh were interesting to KLI. But KLI's International Department, after reviewing the proposals, expressed concern about the risks.

KLI's "International Department" was a small department, and had responsibility for KLI's limited foreign investments. In a short memorandum of December 17, 1996 directed to the "Director of the Stock Department" ("the International Department Memo"), the Department expressed concerns that the proposed size of the Morning Glory transaction, $100 million, and its involvement with foreign financial institutions would attract the scrutiny of Korean regulators and the government au-

diting agency. The memorandum was also critical of the exchange risks that would be borne by KLI:

> The current deal is based on the anticipation of a stable trend that Japanese Yen and Thai Baht will change in the same direction, and assumes the multiple factor for the change rate of both currencies as 5. The pertaining calculation is based on the purchase of 5 forward products that are discounted by 3.2%. However, recently, the increase of the current account deficit of Thailand and instability of its economic condition is causing more demand for changes in the system determining the exchange rate for the Thai Baht and for devaluation. Therefore, it should not be overlooked that there is a possibility that the multiple relationship of the change rate for these two currencies may become lower or the direction of changes may reverse.... In case that the devaluation rate for the Baht against the Yen becomes greater than 1/5, it may result in losses at maturity and a risk of wiping out the profit (7.8%) from the difference in interest rates.

The memorandum warned that the proposed transaction was not cancelable before maturity if market conditions became unfavorable.

Promax and Dr. Chi responded the next day, on December 18, 1996. In response to the concerns about the attitude of Korean regulators, Promax stated that "we can manipulate the process in many ways so that it won't be conspicuous even to market experts not to mention the supervisory agencies," and that as to the complexity of the deal, the "structure of the deal only looks complex to ensure the safety and confidentiality of the deal." As for the concern that KLI would bear substantial risk, Promax explained that there would be "a certain degree of currency risk" in return for increased return. As to the risk of baht devaluation, Promax pointed out that the Thai government had defended the baht in the past, and would be unlikely to make drastic changes in currency policy: "Even if the government indeed abandons the existing currency strategy, devaluation of the Baht would be an extremely radical measure." An article from the October 22, 1996 Asian Wall Street Journal was appended, which noted deterioration in Thailand's trade balance and other potential pressures on its currency, but which concluded that concerns about shifts in the Thai government's currency policy were perhaps overstated. Promax concluded with its opinion that "[t]he anticipated rate of return for this deal is 16% and the only risk is the devaluation of Baht. Considering the Baht exchange rate and the economic outlook, the possibility for devaluation is extremely low." Finally, Promax commented that if market conditions shifted, the transaction could be undone by executing a "reversing transaction."

KLI's Equity Department agreed that the transaction should be executed, but based on the concerns of the International Department, concluded that it should reduce the borrowed amount from $100 million to $25 million. In addition, section 2(e) to the Morning Glory/KEB swap confirmation, giving Morning Glory the right to cause the settlement date of the transaction to be accelerated, from January 30, 1998 to two days after Morning Glory's demand to KEB, was added as a "reversing transaction" in response to the International Department's worries about not being able to cancel the transaction before maturity.

### E. The Value of the Thai Baht Plummets

As of January 1997, and for years previous to that, the Thai government had

maintained a policy of protecting the exchange rate of the baht relative to a "basket" of foreign currencies, including the U.S. dollar, the Japanese yen and the German mark. The Bank of Thailand had allowed the baht to trade within a specified "band" of value relative to the basket of currencies.

The stable baht marked growing prosperity of the southeast Asian economies, a prosperity which, towards the end of 1996, had shown signs of weakening. On July 2, 1997, the Thai government dramatically changed its currency policy, unhinged the relationship of the baht relative to the fixed basket of currencies and allowed it to float free on international currency markets, resulting in a substantial devaluation of the baht relative to the dollar.

The baht's precipitous and substantial decline (from a stable value of approximately 26 baht to the dollar in early 1997 to a value of over 50 baht to the dollar in January 1998) generated a large potential liability for Morning Glory under the baht formula of the swap agreements. Ultimately, due to the baht's decline, the "Baht Payment Amount" owed under the swap formulas by Morning Glory to KEB, and in turn owed by KEB to Morgan, amounted to approximately $66 million, in addition to the 96.75 percent of the $25 million notional amount that Morning Glory was obligated to repay. Under the LOC and Security Agreement, KLI, by its obligation to purchase sufficient shares of Morning Glory to enable Morning Glory to satisfy its debt to KEB, and KEB, its debt to Morgan, was the guarantor of this $90 million obligation of Morning Glory, through KEB, to Morgan.

### F. *Morning Glory's Demand to Unwind the Swap Agreements.*

Beginning on or about July 8, 1997, KLI began requesting that Morgan unwind the transaction, first orally and then, on October 16, 1997, by written demand by Morning Glory and KLI to KEB pursuant to clause 2(e) of the Morning Glory/KEB Agreement. Morgan, in response to the initial oral demands, expressed concern about unwinding the transaction because of inadequate liquidity in the baht currency market, and instructed KLI to send any request to unwind to KEB. Following these instructions, on October 16, 1997, B.C. Kim, of KLI, on behalf of I–Soo Joe, the Director of KLI's International Department and a director at Morning Glory, gave written demand by telefax to Joongseok Ahn of KEB, requesting that the baht part of the transaction be unwound. KEB relayed KLI's telefax to Morgan. Neither KEB nor Morgan acted on Morning Glory's demand, then or in the conversations and meetings that followed. Morgan blamed KEB, and KEB blamed Morgan, as the party refusing to unwind the transaction.

### G. *Baht Leg of Swaps Actually Unwound On January 7, 1998*

On January 7, 1998, 23 days before the termination date of the Morning Glory Transactions, Morgan executed an unwind of Morning Glory's baht positions, at the value of 54.57 Thai baht to the U.S. dollar. On January 27, 1998, Morgan made demand on KLI, that KLI pay the entire amount due—$66,304,746 under the formulae, plus 96.75 percent of the $25 million borrowing, or $90,492,246 in all. As payment, KLI/Morning Glory, KEB, and Morgan entered into a Loan Facility Agreement, pursuant to which KLI (through Morning Glory) (a) repaid the 96.75 percent of the original $25 million borrowed; (b) repaid another $16.3 million (approximately) in cash; and (c) borrowed $50 million from Morgan at an interest rate of LIBOR plus 700 points (7 per cent over

LIBOR), payable semi-annually each year until the maturity date of January 30, 2000, thereby repaying the $90,492,246.

KLI now sues for a return of the sum it paid, on the bases, alternatively, of fraud, negligent misrepresentation, illegality, violation of New York's anti-gambling statute, breach of contract, unjust enrichment, and commercial frustration or impracticability. After extensive discovery, Morgan moved for summary judgment, contending that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law on all of plaintiffs' claims.

## DISCUSSION

### A. *Summary Judgment Standards*

Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, *see Harlen Assocs. v. Village of Mineola*, 273 F.3d 494, 498 (2d Cir.2001), the non-moving party must raise more than just "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[M]ere speculation and conjecture is insufficient to preclude the

granting of the motion." *Harlen*, 273 F.3d at 499. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). I find that there are no genuine issues of material fact on plaintiffs' fraud, negligent misrepresentation, unjust enrichment, frustration, impracticability, illegality, and gambling claims, and, therefore, on these claims, summary judgment is granted to defendant. Likewise, there are no genuine issues of material fact on plaintiffs' breach of contract claim, and on the undisputed evidence presented by the parties, I find that summary judgment on that claim is appropriately granted to plaintiffs.[7]

### B. *Plaintiffs' Fraud and Negligent Misrepresentation Claims*

Plaintiffs allege in their complaint that Morgan, through Dr. Chi and Promax, fraudulently induced plaintiffs to enter into the Morning Glory transactions by misrepresenting the stability of the Thai baht. Plaintiffs also allege that Dr. Chi and Morgan did not use reasonable care in explaining to plaintiffs the nature and risks of the Morning Glory transactions, and that this lack of reasonable care constituted negligent misrepresentation.

To prove fraud, plaintiffs must show: (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiffs thereby, (3) the plaintiffs reasonably relied upon the representation, and (4) the plaintiffs suffered damage as a result of such reliance. *Banque Arabe et Internationale D'Inves-*

---

**7.** Although plaintiffs have not moved for summary judgment, a motion for summary judgment authorizes the district judge to search the record, and to grant summary judgment to the party entitled thereto, regardless whether that party was the moving party. *See Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991); *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir.1983).

*tissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995). To prove negligent misrepresentation, plaintiffs must show that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that it should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiffs for a serious purpose; (4) the plaintiffs intended to rely and act upon that representation; and (5) the plaintiffs reasonably relied on it to their detriment. *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 20 (2d Cir.2000).

■ Central to both of these claims is that plaintiffs actually and reasonably relied on Morgan's representations in deciding to enter into the Morning Glory transactions. Without such reliance, there is no cause of action for fraud or negligent misrepresentation. *See Kregos v. Associated Press,* 3 F.3d 656, 665 (2d Cir.1993). The evidence shows that plaintiffs could not reasonably have relied on Dr. Chi and Promax's representations about the nature of the transaction or the stability of the Thai baht, and without this reliance, plaintiffs' claims of fraud and of negligent representation must fail.

KLI argues that Dr. Chi misrepresented that the nature of the swap transaction was a hedge against yen appreciation, but it is plain that plaintiffs did not rely on this alleged misrepresentation in deciding whether to enter into the transaction. Plaintiffs did not enter into the transaction in reliance on the belief that they were entering into a synthetic low-cost yen-financing deal. The memoranda between Promax and KLI make it clear that both parties understood that the transaction was structured in a way as to appear to be yen-financing, when its focus was a bet on the stability, or instability, of the baht.

For example, Promax's memo stated that "the Thai Baht portion [of the deal] corresponds to the income and risk" of the deal. Moreover, it cannot be said that KLI did not understand the nature of the transaction; both its Equity Department and the International Department did analyses of the transaction, and fairly identified the risks involved. And the terms of the Total Return Swap Agreements that KLI reviewed and executed provided notice that the baht might not hold its value and that the nature of the transaction was speculative. The agreements provided that if the value of the baht fell proportionately more than the yen, Morning Glory would have to pay KEB an amount in U.S. dollars that would vary directly and by multiples according to how much decrease would be experienced in the baht's value in relation to the yen and the dollar. In agreeing to take part in the Morning Glory transactions, plaintiffs were on notice that the Thai baht could fall. Indeed, the only way to understand the Morning Glory Transactions is as a bet that the baht would not decrease more than the yen, in relation to the dollar, between January 21, 1997 and January 30, 1998.

Furthermore, although KLI had not before taken part in a total return swap transaction, and the transaction was complicated and difficult to comprehend, the parties to the transaction were sufficiently sophisticated to understand it. They understood that currencies fluctuate. Indeed, notwithstanding opinions by Dr. Chi, on behalf of Morgan, that the Thai government probably would not eliminate the tie between the baht and the basket of stable currencies, the possibility of a substantial devaluation of the Thai baht within the year of the proposed transaction was a risk in the transaction that some employees of KLI considered inappropriate for a life insurance company. Thus, KLI's Interna-

tional Department recommended that KLI not take part in the transaction because of concern about the current account deficit of Thailand and a perceived instability of its economic condition. These concerns caused KLI to reduce the size of the proposed transaction, from $100 million to $25 million.

Promax itself, in responding to the KLI International Department Memo, conceded that there was "a certain degree of currency risk," while minimizing the possibility that the Thai government would untie the baht. The Asian Wall Street Journal article of October 22, 1996, which was attached to Promax's memo, reported deteriorations in the stability of the Thai economy and its currency and differing opinions of financial analysts, some expecting a "financial meltdown" in Thailand, and some expressing the view that a devaluation was unlikely. The memorandum concluded that "it is difficult to make any predictions" about the currency situation.

There is therefore no merit to KLI's contention that it was deceived by Promax and Morgan. It was clear to KLI that Dr. Chi's representations were opinions incident to a selling effort, that others disagreed with his opinions, and that there could not have been justifiable reliance by KLI on Dr. Chi's opinions concerning the continuing financial strength of the Thai baht. *See Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F.Supp.2d 265, 278 (S.D.N.Y.2001) ("A representation with respect to an unreckonable fu-

ture phenomenon ... in circumstances that could neither be foreseen with certainty nor controlled with precision is too heavily freighted with prophecy, speculation and chance to support a cause of action for fraud.") (internal citation omitted); *Channel Master Corp. v. Aluminium Ltd. Sales*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 836 (1958); *Shoucair v. Read*, 88 A.D.2d 718, 451 N.Y.S.2d 281, 283 (3d Dep't 1982).

In sum, KLI could not reasonably have relied on any of the representations made by Morgan, directly or through Dr. Chi or Promax. Plaintiffs' claims alleging fraud and negligent misrepresentation cannot succeed. Counts One and Two are dismissed.

### C. Plaintiffs' Illegality Claim

Plaintiffs argue that KLI's obligation to pay Morgan under the Letter of Commitment and Security Agreement that it executed in favor of Morgan was illegal, as a guaranty forbidden by the Korean laws pertaining to life insurance companies.[8] Plaintiffs seek the return of the $66.3 million in cash and notes that KLI paid Morgan. Plaintiffs cite Article 19 of the Korean Business Insurance Act and Article 61 of the Insurance Supervision Regulations in support of their position.

Article 19 of the Korean Business Insurance Act requires an insurer, in operating its property, to "work to ensure the safety, profitability, liquidity and public in-

**8.** Although plaintiffs' submissions and contentions focused on the Letter of Commitment alone, the Security Agreement should be read together with the LOC. The LOC required KLI, in the event that Morning Glory lacked funds to discharge its obligation to KEB, and KEB to discharge its obligation to Morgan, to contribute funds to Morning Glory sufficient to enable Morning Glory to pay KEB, and KEB to pay Morgan. The Security Agreement assured Morgan that Morgan would be the beneficiary of the payment obligations of the LOC, and Morning Glory, KEB, and Morgan were all parties to the Security Agreement. The two documents together make it clear that KLI had obligated itself to contribute the funds that were to be used to enable the obligors of Morgan to discharge their debts to and for the benefit of Morgan. KLI's obligation was that of a guarantor, to assure the payment owed to Morgan by Morgan's direct and indirect obligors.

terest." Article 61 of the Insurance Supervision Regulations, promulgated by the Insurance Regulatory Authority pursuant to the Business Insurance Act, provides that "[a]n insurance company shall not provide its assets as security for a third party or guaranty an indebtedness of a third party." KLI argues that the Letter of Commitment (and the Security Agreement), by providing that KLI would contribute funds to Morning Glory sufficient to enable Morning Glory to pay its debt to KEB, and thereby enable KEB to pay its counterpart debt to Morgan, amounted to a guaranty of the Total Return Swap Agreements that was *ultra vires* and, therefore, null and void. KLI further contends that because the LOC (and the Security Agreement) are illegal and cannot be enforced against KLI, Morgan should be required to repay its alleged gain as money it unlawfully had and received.

■ In cases alleging a violation of foreign law, the existence of illegality is to be determined by the local law of the jurisdiction where the illegal act is done, while the effect of illegality upon the contractual relationship is to be determined by the law of the jurisdiction which is selected under conflicts analysis. Restatement (Second) of Conflict of Laws § 202 cmt. c (1971); *Dornberger v. Metropolitan Life Ins. Co.*, 961 F.Supp. 506, 533 (S.D.N.Y.1997). Thus, whether the LOC was an illegal contract must be determined under Korean law. Much expert testimony has been provided on this issue, by affidavits, depositions, and direct and cross-examinations at an evidentiary hearing before me. I am authorized to resolve the issues of Korean law as a matter of law, and I may consider any relevant material or source, whether or not admissible under the Federal Rules of Evidence. Fed.R.Civ.P. 44.1; *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir.1998).

The experts dispute whether the LOC constitutes a "guaranty" in violation of Article 61 of the Business Insurance Act and, if it is a guaranty, whether Korean law requires that a transaction based on such a guaranty should be invalidated.

The LOC provides that if the Net Asset value of Morning Glory falls below "100 percent of the Liabilities on any Valuation Date," that KLI, "subject to any restrictions under Korean law, shall subscribe for ... additional Shares at the Net Asset Value per Share ... so that the New Asset Value of [Morning Glory] shall exceed 102 percent of the Liabilities." The LOC also requires that if Morning Glory has insufficient assets to pay its liabilities in full on the due date, KLI will subscribe for additional shares in an amount sufficient to enable Morning Glory to pay all liabilities in full. The purpose of the LOC was to assure that Morning Glory would have sufficient funds on January 30, 1998, when the Total Return Swap transactions came due, or on any other Valuation Date, to pay KEB, and thus to enable KEB to fulfill its obligation under its Total Return Swap Agreement with Morgan.

Morgan's expert, Dr. Jin Su Yune, a Professor of Law at Seoul National University who specializes in the Korean Civil Code, testified that in his opinion the LOC was not a guaranty and that, even if it were, Korean law would not invalidate the agreement. Dr. Yune expressed the opinion that, since "guaranty" was not defined by the Business Insurance Law, the definition of the Civil Code, Article 428(1), should be followed: one who is "liable to perform the obligation that the principal obligor has failed to perform." Dr. Yune argued that since Morning Glory's obligation to KEB was to pay money, while KLI's obligation under the LOC was to subscribe for additional shares of Morning

Glory, the obligations were not identical, and do not constitute a guaranty.

Dr. Yune expressed the opinion, based on a 1989 decision of the Korea Supreme Court, that even if the LOC did constitute a guaranty, Korean law would not invalidate it. That decision held that while an insurance company's guaranty of $2 million violated the Business Insurance Act, the guaranty did not have a "clear anti-social or unethical nature," and did not have to be invalidated in order to achieve the purpose of the business insurance law. 88 DaKa 2233 (S.Ct. Korea 1989). Thus, according to Dr. Yune, even if a guaranty violates Article 61, it will not necessarily be invalidated by a Korean Court.

KLI's expert, Dr. Kon Sik Kim, a Professor of Law at Seoul National University who specializes in corporate law, securities regulations, insurance law, and commercial law, testified in disagreement with Dr. Yune. Dr. Kim expressed the opinion that the LOC constituted a guaranty. In his opinion, the obligation in the LOC requiring KLI to subscribe for additional shares of Morning Glory in order to specifically allow Morning Glory to perform its obligation to KEB constituted a payment of money to fulfill the debt of the obligor to the obligee, and was indistinguishable from a guaranty. And the guaranty, Dr. Kim concluded, put KLI in the position of being responsible for up to $125 million in liabilities, exactly the kind of transaction–one that would expose an insurance company to serious financial risk–that Article 61 sought to avoid. Dr. Kim distinguished the 1989 Supreme Court case upon which Dr. Yune relied as involving a guaranty of only $2 million, which did not implicate the integrity of a financial institution of the size and prominence of KLI.

Dr. Kim supported his view with a 2002 decision of the Korea Supreme Court, invalidating a guaranty of a mutual financing company. The case, decided under the Korean Savings and Loan Act, held that "a mutual financing company cannot make borrowings in excess of its equity," and that, if it did so, any such undertaking would violate the law and be deemed void. 2000 Da 42625 (S.Ct. Korea 2002). Dr. Kim analogized this case to the instant one, opining that the Savings and Loan Act, which prevents savings and loan associations from borrowing in excess of shareholders' equity, expressed the same policy as that which informed the Business Insurance Act, and that the LOC should be nullified pursuant to Article 103 of the Korean Civil Code, which provides that "[a] juristic act which has for its object such matters as are contrary to good morals and other social order shall be null and void."

A disagreement of the experts as to an issue of foreign law does not foreclose the granting of a motion for summary judgment. *See* Fed. R.Civ.P. 44.1; *Merican, Inc. v. Caterpillar Tractor Co.,* 596 F.Supp. 697, 700 (E.D.Pa.1984).

■ A "guaranty" is a promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance. Black's Law Dictionary 712 (7th ed.1999). The LOC was intended to obligate KLI to subscribe for additional Morning Glory shares in the event of Morning Glory's default, thus infusing money into Morning Glory to enable it to pay, as obligor, the debt it owed to Morgan, through KEB. The Security Agreement made Morgan the beneficiary of those funds, thus providing a direct link between KLI and Morgan by which KLI was to satisfy Morning Glory's debt to KEB, and KEB's debt to Morgan. Clearly, KLI's promise, under the Letter of Commitment it executed and delivered to Morgan and the Security Agreement, was a promise to

answer for the debt of Morning Glory, for the benefit of Morgan. Under Article 428(1) of the Civil Code, the promise of KLI in the LOC made KLI "liable to perform the obligation that the principal obligor [Morning Glory] has failed to perform," by infusing money into Morning Glory to enable it to pay KEB, and KEB to pay Morgan. Effectively, KLI was liable under the LOC to perform the obligation that Morning Glory was to perform, even if the obligation technically had formal differences. KLI's undertaking in the LOC was the functional equivalent of a guaranty. And as a guaranty, it violated Article 61 of the Business Insurance Law.

The question then becomes whether or not the LOC should be invalidated. In the 1989 case, the Korean Supreme Court held that the guaranty did not "lack [a] clear anti-social or unethical nature," that Article 61 was regulatory in nature and did not give rise to a private right of action and, accordingly, the lower court could refuse to void the guaranty under Article 61, even if it violated the law. But Dr. Yune's broad reading of the decision, that Article 61 should never be applied to invalidate a decree, goes too far. I believe that Dr. Kim's explanation, that the more "anti-social or unethical" the nature of the guaranty and the greater the effect on the solvency of the issuer, the more violative of the purpose behind the Business Insurance Act, and the more likely a court would invalidate it, is the better understanding of what the Korean Supreme Court would hold. Dr. Kim's interpretation better reflects the policy of the statute, to protect the interest of "insurance policy holders, insurance policy beneficiaries, and other interested parties through efficient guidance and supervision of the insurance business," and to avoid putting these insurance policy holders and beneficiaries at risk by a profligate commitment of guaranty. *See* 88 DaKa 2233.

However, it is unclear what the effect of Section 2(e) would be on this analysis. Section 2(e), by inserting a stop-loss provision into the agreement with KEB, and, by implication, into KEB's swap agreement with Morgan (see discussion, next section), served to mitigate Morning Glory's, and thus KLI's, exposure, and limited the open-ended feature of KLI's guaranty.

I asked Dr. Kim if section 2(e) of the Morning Glory/KEB agreement might affect the outcome in this case. Dr. Kim had not considered the question before testifying but, after reviewing the question overnight, expressed the opinion that the guaranty still violated Article 61 because it depended, for its application, on the willingness of employees of an insurance company to concede that they had improperly committed to a guaranty that the law did not authorize, and the main purpose of Article 61 was to prevent such a guaranty altogether.

■ A district judge in New York should hesitate to declare his opinion on such a difficult and disputed point of foreign law. Fortunately, it is not required that I do so, for the effect of illegality upon a contractual relationship is determined, not by Korean law, but by the law of the jurisdiction which is selected under conflicts analysis. *Dornberger*, 961 F.Supp. at 533. Because this is a diversity case, the conflicts law to be applied is that of New York. *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 137 (2d Cir.1991); *Fuchsberg & Fuchsberg v. Chicago Ins. Co.*, No. 00 CIV. 3118, 2001 2001 WL 484013, at *4 (S.D.N.Y. May 7, 2001). Here, the swap agreements contained a clause providing that New York law was to govern disputes among the parties. Under New York conflicts analysis, the choice of law agreed to by the parties is to be given presumptive effect.

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1362 (2d Cir.1993) ("[C]hoice of law clauses are presumptively valid where the underlying transaction is fundamentally international in character."); *see M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). Both parties have cited to New York law in support of their respective contentions about the effects of invalidity, recognizing that the issue, whether an allegedly invalid contract can be enforced, must be determined by New York law. *The Bremen*, 407 U.S. at 15, 92 S.Ct. 1907; *see also Fricke v. Isbrandtsen Co.*, 151 F.Supp. 465 (S.D.N.Y.1957); Restatement (Second) of Conflict of Laws § 187 (1989). I thus proceed to consider if the LOC would be invalidated under New York law.

▮▮▮ Under New York law, an illegal contract *malum in se* is unenforceable and will be voided. *Tracy v. Talmage*, 14 N.Y. 162, 179 (1856). A contract that is illegal because performance is *malum prohibitum* may also be voided if: (1) the contract is still executory; or (2) the parties are not *in pari delicto. See id.* at 181–82; *see also Spring Co. v. Knowlton*, 103 U.S. 49, 57–58, 13 Otto 49, 26 L.Ed. 347 (1880); *Farrington v. Stucky*, 165 F. 325, 330–31 (8th Cir.1908). New York courts will also ascertain if the statute that was violated was enacted to protect public health and safety, and whether the party seeking to assert the defense of illegality is part of the class of persons intended to be protected by that statute. *United States SBA v. Citi-*

*bank, N.A.*, No. 94 Civ. 4259, 1997 WL 45514, at *10 (S.D.N.Y. Feb. 4, 1997); *Lloyd Capital Corp. v. Henchar*, 80 N.Y.2d 124, 589 N.Y.S.2d 396, 603 N.E.2d 246, 248 (N.Y.1992).[9]

▮▮▮ The transactions made by KLI and Morgan and their respective affiliates, and the documents that reflected them, were not evil in themselves (*malum in se* ). The purpose of the parties to evade Korean regulation and to enter into an inappropriate transaction may have been questionable, but it does not amount to moral turpitude. The transactions and related documents may be characterized as *malum prohibitum*. The issue regarding enforceability of such transactions is whether or not they remain executory, and whether or not the parties were *in pari delicto.*

▮▮▮ New York courts will invalidate a contract that is executory, on the theory that where the illegal contract is incomplete, there is still a *locus penitentioe*, so that a disaffirmance of the illegal conduct by the court is appropriate. *See Spring Co.*, 103 U.S. at 60, 103 U.S. 49. When the contract has been executed, however, a New York court will not invalidate it. *Id.* at 58; *Tracy*, 14 N.Y. at 181. Here, KLI fulfilled its obligation under the LOC, paying in full its debts under the agreement. The contract was no longer executory.

▮▮▮ Furthermore, in New York, a contract generally will be voided only when the parties to the illegal transaction

---

9. I need not reach the issue whether the Korean Insurance Laws were enacted to protect public health and safety. As explained by Dr. Kim, the protections of the Korean Insurance Laws were intended to benefit, not only shareholders and beneficiaries of insurance companies, but also the public interest in a sound economy as affected by Korean financial institutions, and to assure the public generally of reliable life insurance protection. However, Korea Life brings suit on behalf of

itself, and not on behalf of its beneficiaries or the general public. Because Korea Life is not of the class protected by the Korean Insurance Laws, it cannot rely on the defense of illegality as a grounds to nullify its contract. *United States SBA*, 1997 WL 45514, at *10; *Richards Conditioning Corp. v. Oleet*, 21 N.Y.2d 895, 289 N.Y.S.2d 411, 236 N.E.2d 639, 640 (1968); *John E. Rosasco Creameries v. Cohen*, 276 N.Y. 274, 11 N.E.2d 908, 909 (1937).

are not equally guilty. *Tracy,* 14 N.Y. at 181 (distinguishing between "those illegal contracts where both parties are equally culpable, and those in which, although both have participated in the illegal act, the guilt rests chiefly upon one"). Although KLI claims that it was the naive, innocent party in this transaction, the evidence shows that *both* KLI and Morgan intended to engage in a transaction in violation of Korean law, and endeavored to escape the eyes of regulators by setting up off-shore shell corporations and structuring the transaction as to be virtually impossible to understand to a party not familiar with it. Thus, KLI entered the deal notwithstanding its International Department's warning that the deal could be subjected to auditing by regulators, and Promax's memo to KLI advised that the structure of the deal was meant to "look complex to ensure the safety and confidentiality of the deal." Promax's memo advised KLI that there was "no way for any third party to know the specifics of the deal unless it is announced by the parties to the deal," and that KLI would have "no part" in the offshore transactions. This exchange plainly shows that KLI and Morgan were looking to evade Korean insurance regulations, and that both parties were culpable in taking part in a transaction that they knew was constructed specifically to do so.

Moreover, it is clear that both parties agreed to the terms of the LOC and the Security Agreement, and that KLI was not tricked into engaging in a transaction that was illegal. Indeed, KLI represented and warranted in the LOC that it had the "full power, authority and legal right to enter into and perform" the obligations it undertook thereunder, despite the fact that such obligations violated Korean law. As the Korean party to the agreement, KLI could be charged with at least as much familiarity, if not more, with Korean law as Morgan, and in making its representations,

should have been aware of the potential illegality of its guaranty. Under such circumstances, the LOC will not be invalidated. Morgan's motion for summary judgment on this claim is granted, and KLI's illegality claim is dismissed.

#### D. *Plaintiffs' Gambling Claim*

■ Plaintiffs' sixth cause of action alleges that the transactions at issue were "bets" in violation of the New York Anti–Gambling Statute. *See* N.Y. G.O.L. § 5–401. Although I have characterized KLI's swap agreements as "bets" and "speculations" on currency fluctuations, the transactions were in the form of forward contracts, swaps and derivatives. Derivatives transactions, forward contracts and swap agreements in currencies and commodities are not considered illegal gambles, and do not violate New York's gambling statute. *See General Elec. Co. v. Metals Res. Group,* 293 A.D.2d 417, 741 N.Y.S.2d 218, 219 (1st Dep't 2002) (holding that a commodities swap agreement is "not an illegal contract to gamble ... [and is] exempt from the strictures of ... § 5–401"). As such, summary judgment is granted to defendant on this claim.

#### E. *Plaintiffs' Contract Claims*

The Total Return Swap Transaction Confirmation Agreement between KEB and Morning Glory contained a stop-loss provision giving Morning Glory "the right as of any Business Day on a full two-way payments basis to terminate the Transaction at the prevailing market value, as determined by the Calculation Agent in a reasonable and fair commercial manner, on at least two (2) Business Days prior notice." Thus, Morning Glory, upon notice to KEB, could demand that its forward contracts for baht and yen be unwound, at market prices determined by Morgan, the Calculation Agent designated under the

Agreement. There was no correlative provision, however, in the KEB/Morgan Total Return Swap Transaction Confirmation Agreement.

KLI alleges that, on or before October 16, 1997, it gave written notice to KEB and to Morgan, demanding that its forward contracts be unwound, and that both failed and refused to do so. The yen forward contract was unwound on October 9, 1997, without material financial consequence. However, the baht forward contract transaction was not unwound until January 7, 1998, by which time the value of the baht had depreciated considerably, almost doubling KLI's loss from the date of demand.

On October 16, 1997, B.C. Kim, a KLI manager in its Fixed Income Department, sent a telefax to Joongseok Ahn, a general manager of KEB, requesting that the baht part of the transaction be unwound. The telefax was sent following numerous telephone calls and meetings between KLI and Morgan, by which KLI pressed Morgan to unwind the baht forward contracts, only to meet resistance by Morgan. Morgan maintained that the baht contracts could not be sold because of concerns about the liquidity of the baht and because the back-to-back transactions, between Morning Glory and KEB, and KEB and Morgan, required that written demand be made on KEB. Kim's October 16, 1997 telefax, which was sent to KEB on behalf of I–Soo Joe, a director of Morning Glory and KLI's International Department, followed. Joongseok Ahn, who received the fax, understood that it was from KLI and Morning Glory, since he was the general manager of the KEB department that managed Morning Glory's positions in baht, yen and dollars.

Kim called Ahn to confirm that KEB had received KLI's written demand. Ahn confirmed receipt, but told Kim that the unwind had not occurred, and that Mor-

gan, the Calculation Agent, had not supplied a market value figure. Kim called Morgan, but Morgan disclaimed having received written notice from KEB. Kim called KEB again, and KEB confirmed that it had, in fact, conveyed KLI's notice to Morgan, but that Morgan had stated that it would not execute KLI's demand to unwind. Kim called Morgan, and Morgan stated that it would not execute KLI's demand because KEB did not want the transaction to be unwound.

Morgan does not dispute these facts, and must concede, therefore, that it knew, by reason of both KLI's written and oral notices, that KLI wanted its baht position unwound, and that it was Morgan's decision not to comply with the demand. Clearly, Morgan had actual knowledge, and therefore is deemed to have notice that KLI made demand pursuant to the unwind provision, section 2(e) of the Morning Glory/KEB swap agreement. *Leasing Serv. Corp. v. Diamond Timber, Inc.,* 559 F.Supp. 972, 978 (S.D.N.Y.1983) (holding that notice occurs when party charged with having notice has actual knowledge or when "from all the facts and circumstances known to him at the time in question, he has reason to know that it exists") (internal citation omitted).

Morgan's position is that it owed no duty to honor KLI's demand to unwind, since there was no stop-loss provision comparable to section 2(e) in the KEB/Morgan swap agreement. And, since there was no comparable clause to section 2(e) in the swap agreement between KEB and Morgan, KEB had no right to demand that Morgan unwind baht positions before the maturity date, January 30, 1998.

■ However, the two swap agreements, between KLI and KEB, and between KEB and Morgan, were not intended to be independent. They were tied

counterparts. The Morning Glory/KEB swap agreement provided the methodology of Morning Glory's investment of the $25,000,000 contributed to it by Morgan's affiliate, Promax, and the first leg of Morning Glory's repayment obligation, a payment to KEB. Clearly, KEB had no real-party interest, once it redeemed the $25,000,000 letter of credit deposited by Morning Glory. KEB's interest was that of an intermediary, between Morning Glory and Morgan or, alternatively, as was characterized in the parties' Indicative Term Sheet of January 10, 1997, the agent of Morning Glory, acting "for and on behalf of Morning Glory Investment (L) Limited." [10] The KEB/Morgan swap agreement was intended to complete the circle, to provide the completion of repayment of the $25,000,000 to Morgan, to enable Morgan, in turn, to repay Frome, and Frome to repay the European investors who had originally put up the $25 million investment a year earlier. KEB's interest was to earn a modest banking fee of $70,000, as an accommodation party and not as a party intending to assume the large speculative risk of forward bets on currency fluctuations.

Morgan prepared the counterparts, not as a single, understandable agreement, but, as Dr. Chi of Morgan explained to the concerned representatives of KLI, in pieces, so the "process ... won't be conspicuous even to market experts not to mention the supervisory agencies." Dr. Chi structured the deal so that it "looks complex," to ensure its "safety and confidentiality," and to "manipulate the process." One law firm, Kim & Chang of Seoul, represented all parties, even though there were other Korean law firms with

competence and capacity. All the agreements were executed at the same time, on January 15, 1997, and all were prepared by Morgan, in separate pieces and with disparate formulae to disguise the transaction and evade Korean regulatory review.

Morgan, even as it seeks to use the argument of privity as a sword, made sure that it had an adequate shield to prevent KLI from making use of that same argument to avoid liability. Morgan had KLI execute a Letter of Commitment, to provide Morning Glory with funds if the Thai baht were to depreciate against the dollar and the $25,000,000 of invested funds would be inadequate to pay KEB, to enable KEB to have the funds necessary to pay Morgan. Morgan also had Morning Glory execute a Security Agreement, binding Morning Glory to secure Morgan in the event that KEB was unwilling or unable to deliver funds to Morgan sufficient to pay Morgan the entire debt owed by Morning Glory. The Letter of Commitment and the Security Agreement provided a direct relationship of privity between KLI and Morgan, assuring Morgan that both Morning Glory and KEB would fully and completely discharge the contractual obligations owed to Morgan under both the Morning Glory/KEB and the KEB/Morgan Total Return Swap Agreements.

The structure of the transactions, and a fair understanding of all the documents, including how they should be carried out, make it clear that the parties intended one integrated set of transactions. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572–73 (2d Cir.1993) (discussing that, under New York law, a written contract may be formed from more than one writing, and that "the relevant

---

**10.** The Indicative Tem Sheet had been delivered to the parties by Morgan on January 10, 1997, and was executed by KEB, Morning Glory and KLI. It was replaced by the two Total Return Swap Agreements, and the LOC and the Security Agreement, all executed on January 15, 1997.

writings creating a contract may consist of letters bearing the signature of only one party or even memoranda unsigned by either party"); *Houbigant, Inc. v. ACB Mercantile (In re Houbigant, Inc.),* 914 F.Supp. 964, 994 (S.D.N.Y.1995) ("[W]here two or more writings are executed as part of the same general transaction, they are to be read together as part of the same agreement."); *Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 110 N.E.2d 551, 553 (1953). In such instances, the instruments should be read as one in order to carry out their intent. *See* 3 *Corbin on Contracts,* Sec. 549, pp. 188–190 (1960) (stating that "the terms of [a contract] agreement may be expressed in two or more separate documents.... These documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others. This is true whether the documents are all executed by a single party or by two or more parties, and whether some of the documents are executed by parties who have no part in executing the others."). The separately executed documents, executed at the same time for an integrated purpose, should be understood to constitute the "same bargain." *Serralles v. United States,* 46 Fed. Cl. 773 (2000); *see also Williams v. Mobil Oil Corp.,* 83 A.D.2d 434, 445 N.Y.S.2d 172, 175 (2d Dep't 1981).

Indeed, there is no way to look at these instruments other than as pieces of one agreement, structured to disguise a speculative, offshore transaction that posed an unreasonably large risk, and was inappropriate and possibly illegal for a regulated Korean life insurance company to enter into. The special purpose entities and intermediaries that were made parties to the contracts were not intended as the real parties in interest. The real parties in interest were KLI and Morgan, and just as KLI owed duties to pay Morgan, Mor-

gan had duties to cooperate with KLI should it wish to mitigate its growing losses and demand an unwind, through the clause 2(e) that KLI insisted on as a precondition of its entering into the deal. *See Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 292 (1995) (holding that a promisor impliedly pledges that it shall not do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the promise). Morgan executed the documents with clear knowledge of KLI's insistence on the addition of such a "stop loss" clause in the agreements, and cannot hide behind a false argument of lack of privity as its rationale for first ignoring, and then refusing to heed, KLI's and Morning Glory's demands to unwind, *see Skrabalak v. Rock,* 208 A.D.2d 1100, 617 N.Y.S.2d 912, 914 (3d Dep't 1994) (an obligee may not increase the liability of a guarantor, or otherwise substantially change the nature of the guaranty), especially in light of the fact that Morgan drafted the agreement and designated itself as Calculation Agent. The December 18, 1996 memorandum of Morgan's agent, Promax, which directly persuaded KLI to enter the deal, represented to KLI that if market conditions relating to the stability of the baht shifted, a "reversing transaction" was available to undo the transaction. Given such circumstances, a false defense of lack of privity cannot excuse Morgan's assertion of rights, but refusal to perform correlative duties, expressed in the related instruments.

Morgan argues that the integration clause of the form ISDA agreement, incorporated into both Total Return Swap Agreements, prevents recourse to earlier swap agreement iterations or parol evidence as proof of an overarching agreement. Morgan's argument is without merit. The integration clause provides that

the ISDA Master Agreement "constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto." Yet the parties did not execute the ISDA form, and it does not itself describe the parties' agreement or understanding. The two Total Return Swap Agreements merely incorporated by reference the ISDA form. The agreement and understanding of the parties was expressed not in the ISDA Master Agreement with its integration clause, but in the two Total Return Swap Agreements, and the Security Agreement and the Letter of Commitment executed contemporaneously with the swap agreements. Clearly, all the agreements have to be read together, not separately.

The parties have made substantial submissions on this motion, presenting to me all the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits that they consider relevant, on all the issues raised by defendant's motion for summary judgment, including plaintiff's breach of contract claim. *See* Fed.R.Civ.P. 56(c). Defendant's position is that there are no material issues of fact to try. Both sides have represented that there are no further relevant facts to present. Plaintiffs, however, did not move for summary judgment, and argued that there are triable issues, including whether the Indicative Term Sheet, rather than the two Total Return Swap Agreements, should be considered the agreement.

██ A district judge, presented with a motion for summary judgment, is entitled to search the record and, if no genuine issues of material fact exist, to determine the motion in favor of the party entitled to summary judgment, regardless whether the party is the moving, or the responding, party. *Coach Leatherware Co. v. Ann-Taylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991) (holding that district court's *sua sponte* grant of summary judgment to non-moving party is "an accepted method of expediting litigation"); *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir.1983) ("[A] district judge may grant summary judgment to a non-moving party, if no genuine issues of material fact have been shown.").

I conclude, from my search of the record, that there are no triable issues of fact, that the facts are clear that the Total Return Swap Agreements must be read together, and that Morgan was obligated to honor the demand of KLI and Morning Glory to stop the losses accruing from the deteriorating value of the baht and to unwind Morning Glory's obligation. KLI and Morning Glory, not Morgan, are entitled to summary judgment on the claim that Morgan breached its obligation to honor plaintiffs' demand that Morning Glory's baht position be unwound.

Morning Glory's baht obligation was ultimately not unwound until January 7, 1998, yielding an obligation from Morgan of $66,304,746. Using published exchange values of the baht to the dollar as of October 20, 1997, two business days after KLI's demand, I calculate that an unwind of the baht forward contract executed on that date would have yielded $39,847,800.[11] Thus, had the unwind been executed as demanded, and assuming that amount of $39,847,800, rather than $66,304,746, is the correct amount of loss, KLI overpaid Morgan the difference, or $26,456,946, which Morgan should be obligated to credit, or repay, to plaintiffs.

---

**11.** This amount is calculated using an exchange rate of 37.615 THB per USD, quoted by the Bank of Thailand for October 20, 1997.

But liquidation values of forward currency contracts for deteriorating currencies are not so easily derived. Liquidations of fluctuating assets are often subject to substantial discounts, especially if the asset has been depreciating. Expert proofs are much more appropriate than arithmetical calculations from published currency tables. In addition, the Swap Agreements also provided that Morgan had a payment obligation to KEB, and KEB to Morning Glory, if the yen depreciated against the dollar, and there appeared to have been a relatively small depreciation: from 116 on January 10, 1997 ("YenSpot," as the Swap Agreement characterized it); to 121.18 on October 9, 1997, the date that Morgan liquidated the yen forward contracts; to 127.1 on January 30, 1998, the maturity date of the Swap Agreements ("YenMat"). The correct amounts have to be ascertained.

I will require further submissions from the parties with regard to the amount of damage plaintiffs may recover, in the form of a repayment obligation from Morgan. I will meet with the parties on July 17, 2003 at 10:00 AM in a case management conference to define the issues, and regulate such further proceedings as may be required.

F. *Plaintiffs' Remaining Claims*

Plaintiffs' remaining claims for unjust enrichment and commercial frustration and impracticability are derivative claims. The unjust enrichment claim, which sounds in quasi-contract, *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F.Supp.2d 157, 166 (S.D.N.Y.1998), must be dismissed, as I have already found that there is a valid and enforceable written contract governing the subject matter in dispute. *See Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."). Moreover, the claim, which is based on the contention that plaintiffs were not aware of the risks involved in the transaction so that when the baht was pulled from the currency basket, Morgan realized an unbargained-for windfall, cannot be sustained. As already discussed, the risk involved in the transaction was patent, and a claim for unjust enrichment cannot be premised on a known risk. *See Resolution Trust Corp. v. 53 W. 72nd St. Realty Assocs.*, No. 91 Civ. 3299, 1992 WL 183741, at *3 (S.D.N.Y. July 22, 1992) (holding a claim for unjust enrichment could not be sustained where "known risk" would "merely prevent [the party's] business expenditures from generating the return on investment which had been hoped for").

Plaintiffs' claims based on theories of commercial frustration and impracticability also must fail. The potential devaluation of the Thai baht was a risk of the deal, and not a ground of recision. *See* Restatement (Second) of Contracts §§ 261 & 265 (1981); *Health–Chem Corp. v. Baker*, 737 F.Supp. 770, 776 (S.D.N.Y.1990). Morgan's motion for summary judgment with regard to these claims is granted, and the claims are dismissed.

G. *Conclusion*

For the reasons stated, Morgan's motion for summary judgment is granted in part, and I order that counts one, two, three, five, and six of plaintiffs' Second Amended Complaint be dismissed. I deny Morgan's motion for summary judgment with regard to count four, the count alleging breach of contract, and grant summary judgment to plaintiffs on that count, with the amount of

judgment to be determined in further proceedings.

SO ORDERED.